2015 IL App (2d) 120171
No. 2-12-0171
Opinion filed March 31, 2015

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 08-CF-3321 |
| JOSHUA CAVAZOS, | ) ) ) | Honorable Timothy Q. Sheldon, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Justices Zenoff and Birkett concurred in the judgment and opinion.

**OPINION**

¶ 1     On January 20, 2007, 15-year-old Oscar Rodriguez and his girlfriend, Claudia Lozano, were walking along High Street near Grove Street in Aurora. Gunshots were fired from a passing sport utility vehicle (SUV), killing Rodriguez and injuring Lozano. Defendant, Joshua Cavazos (age 17 when the shooting occurred), and his brother, Justin Cavazos (age 16 when the shooting occurred), were charged in connection with the incident.

¶ 2     In 2011, the brothers were tried simultaneously (in adult court) by separate juries. Joshua's jury convicted him of two counts of first-degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2006)), attempted first-degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2006)), unlawful possession of a stolen motor vehicle (625 ILCS 5/4-103(a)(1) (West 2006)), and

aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2006)).[1]  Further, regarding

the first-degree-murder and attempted-murder convictions, the jury found that Joshua personally

discharged the weapon used in those crimes.  The trial court denied Joshua's posttrial motion,

but granted in part his motion to reconsider his sentence and, ultimately, sentenced him to an

aggregate of 75 years' imprisonment.

¶ 3     On appeal, Joshua argues that: (1) the evidence was insufficient to sustain his

convictions; (2) the jury was improperly instructed on the attempted-murder charge, where the

instruction did not state that, to be found guilty, he had to specifically intend to kill Lozano, as

opposed to merely "an individual"; (3) the attempted-murder conviction must be reversed

because no evidence established that he specifically intended to kill Lozano; (4) Illinois law is

unconstitutional where it automatically subjects juveniles to adult prosecution and sentencing,

without consideration of youthfulness at the time of the offense; and (5) the application to

juveniles of mandatory firearm enhancements (see 730 ILCS 5/5-8-1(a)(1)(d) (West 2006)),

mandatory consecutive sentencing (see 730 ILCS 5/5-8-4(d) (West 2006)), and "truth in

sentencing" provisions (730 ILCS 5/3-6-3(a)(2)(i), (ii) (West 2006) (requiring that Joshua serve

100% of the murder sentence and 85% of the attempted-murder sentence)) is unconstitutional

because the provisions do not permit consideration of youthfulness at the time of the offense.

For the following reasons, we affirm.

¶ 4                                I. BACKGROUND

¶ 5     On November 28, 2011, during jury selection,  the court informed the venire that Joshua

was charged with first-degree murder for the shooting death of Rodriguez and with attempted

---

[1] Justin, who was also convicted, appeals in *People v. Cavazos*, 2015 IL App (2d) 120444.

first-degree murder for shooting Lozano. Similarly, at the end of its opening statement, the State argued that the evidence would show that Joshua was the shooter and "is guilty of first-degree murder of Oscar Rodriguez and also attempted murder of Claudia Lozano[,] who was standing right near Oscar when he was shot. That she was shot at as well."

¶ 6                          A. State's Case-In-Chief

¶ 7     Lozano testified that, on January 20, 2007, she and Rodriguez were in the ninth grade. At around 2 p.m., they were walking down the sidewalk on High Street in Aurora. Rodriguez was closer to the street. Lozano testified that she is nearsighted, which affects her ability to clearly see things at a distance, and was not wearing her glasses that day. A dark, navy blue, four-door SUV drove by, with the driver's side of the SUV closer to the sidewalk. According to Lozano, the passengers on the driver's side started "throwing" gang signs and yelling gang slogans at Lozano and Rodriguez. Lozano testified that, initially, the passengers were throwing signs associated with the Insane Deuces street gang and were saying something similar to, "Deuce love" and "[Latin] King killer." She did not recall anyone in the SUV yelling anything indicating a loyalty to the Latin Kings street gang. Rodriguez responded, "King love." Rodriguez might have known members of the Latin Kings, and his brothers used to wear Latin King colors, but Lozano did not know if they were gang members.

¶ 8     The SUV passed Rodriguez and Lozano, but it did a quick U-turn and, when it returned, the SUV's passenger side was closer to the sidewalk. Lozano heard four or five gunshots come from the SUV. She and Rodriguez fell to the ground. Lozano was hit by a bullet on her left thigh. She stood up, looked at Rodriguez, and saw that he had been shot and his head was bleeding. Rodriguez could not stand up or talk and (as testified to by the medical examiner) died from multiple gunshot wounds. The SUV drove south and made a left turn onto Grove Street.

¶ 9     Lozano testified that she could not identify the people who were inside the SUV, because they were all wearing "hoodies" and her vision was blurry.  She did, however, observe that there were two people in the front seat, and she knew that there was at least one person in the backseat because, when the SUV returned, someone was hanging out of the backseat passenger-side window.  Lozano recalled that this person had the gun.  Lozano told police that she thought that the men in the SUV (she did not hear any female voices shouting from the SUV) were Hispanic, that the driver had a beard or goatee, and that he appeared to be around 17 years old.

¶ 10    Felipe Rojo testified that, for 18 years, he had lived near the intersection of High and Grove Streets in Aurora and could see the intersection from his house.  Around 2 p.m. on January 20, 2007, Rojo was inside his house when he heard a sound "kind of like some gunshots."  Rojo went to the front window and saw a car, similar to a Ford Explorer or Chevrolet TrailBlazer, drive up High Street and turn east onto Grove Street.  The SUV was driving "almost as if it had been sliding, very fast."  Rojo could not recall the SUV's color, but he remembered that it had a yellow permit on its rear license plate.

¶ 11    Officer Ted Hunt responded to the scene.  Dispatch informed him that the suspect vehicle, a black Chevrolet TrailBlazer with a temporary license plate, was last seen going east near Grove Street and High Street.  Hunt proceeded in that direction and located, parked along the curb at 1223 Grove Street, *i.e.*, seven blocks from the scene of the shooting, a black Chevrolet TrailBlazer with a yellow temporary license plate.  Hunt ran the vehicle's information through his computer system and learned that it was stolen.

¶ 12    Jorge Briesca testified that the recovered SUV was his and that he had reported it stolen.  When the SUV was processed for DNA, gunshot residue, and fingerprints, one of the items

tested was a cigar found in the cup holder on the front passenger-side of the vehicle. Briesca testified that the cigar was not his, nor was the cigar in his SUV when it was stolen.

¶ 13    Katharine Mayland, a forensic scientist and latent fingerprint examiner, testified that Joshua's fingerprint was found on the cigar's clear plastic cellophane wrapper.

¶ 14    Four shell casings were found at the scene. Jeff Parise, a forensic scientist specializing in the fields of firearms and firearms identification, studied the casings and opined that they were fired from the same .40-caliber automatic or semiautomatic firearm.

¶ 15                              1. Gang Member Testimony

¶ 16    David Hernandez testified that he previously lived in Aurora. Hernandez joined the Insane Deuces when he was 15 years old, because he was "bored." In 2007, both Justin and Joshua were members of that gang, as was Jaime Barragan (and Ignacio Rios, Eddie Montanez, and Wesley Grant). The gang members would often stay at Manny Caranza's apartment in Aurora. Caranza, also an Insane Deuces member, kept firearms, including .40-caliber weapons, in his apartment. The guns, known as "nation guns," belonged to the gang and were available for any gang member to use when "hunting" (*i.e.*, looking for rival gang members to shoot). At the time of the shooting, the Insane Deuces and the Latin Kings were rivals, and the area of High and Grove Streets in Aurora was known Latin King territory. Generally, "hunting" would be the only purpose for Insane Deuce members to enter that area.

¶ 17    On January 19, 2007, Hernandez, Barragan, and both Cavazos brothers were at Caranza's apartment. Late in the evening, Hernandez and Barragan left the apartment to steal a car. While Hernandez stood as lookout, Barragan stole a black TrailBlazer SUV. The license plate had a "Dempsey" dealership decal. They drove the SUV back to Caranza's apartment and stayed the night.

¶ 18    The next morning, January 20, 2007, Hernandez and Barragan told the Cavazos brothers about the SUV, and then they "hung out," playing video games and talking. At some point, Justin, Joshua, and Barragan, who had been having a conversation in the kitchen, entered the living room and told Hernandez to come with them. The four men got into the SUV: (1) Barragan drove; (2) Joshua sat in the front passenger seat; (3) Hernandez sat in the rear passenger-side seat; and (4) Justin sat in the rear driver's-side seat. They drove around, ate McDonald's food, and then went "hunting" in Latin King territory. On High Street, they saw a "rival gang banger" walking with someone else. When asked if the "gang banger" was a "he" or a "she," Hernandez replied, "he." When asked how he knew that "he" was a rival gang member, Hernandez explained that he was wearing Latin King colors. Further, when the driver's side of the SUV was closer to the sidewalk, someone in the SUV "threw up" the Latin King crown signal. The male pedestrian, who was closer to the street, threw the crown back, "so that notified him as a Latin King."

¶ 19    The SUV drove past the pedestrians, then turned around and came back toward "him." The passenger side of the SUV was now closer to the sidewalk. At that time, Justin handed Hernandez a .40-caliber semiautomatic handgun. Hernandez looked at the gun, held it for a second, and refused to pull the trigger. He passed the gun back to Justin. Justin then passed the gun up front to Joshua. Joshua aimed the firearm out the window and shot three or four rounds. Hernandez looked out the window and saw the male lying on the ground. Hernandez did not remember if, at that time, he was hanging out of the SUV's back window. Barragan sped off and turned left. A few blocks later, they "ditched" the car. They were wearing gloves while in the car and did not wipe it down before running away. The four men split up; Barragan and Justin ran off together, and Hernandez and Joshua ran through some fields until they arrived at a flea

market.  They used the bathroom and then called Caranza for a ride.  While they were waiting, they hid the gun under some leaves and branches by Cowart Middle School.

¶ 20    Caranza picked up Hernandez and Joshua and they returned to his apartment.  Eventually, Joshua and Barragan returned too.  At that time, Caranza, Joshua, Justin, and Barragan had a conversation in the spare bedroom.  Hernandez was not included in that discussion; he was treated like a "coward" because he did not pull the trigger.  As a result of the shooting, Joshua had a tattoo of a spade placed on his back.  Hernandez explained that the spade is a symbol of the Insane Deuces.

¶ 21    Hernandez stated that he was not testifying by choice but rather, was doing so pursuant to a deal he made with the State.  Specifically, Hernandez testified that, in exchange for his testimony, he was accepting a five-year sentence for possession of a stolen motor vehicle (but was hopeful that the court would instead impose five or six months in "boot camp").  He was not charged with murder in connection with this case, but he was charged with possession of a handgun and 12 misdemeanors.  Pursuant to the agreement, he was pleading guilty to the possession charge, and the 12 misdemeanor charges were to be dropped.  Hernandez agreed that when, on October 27, 2007, he gave a statement to police, he was reluctant to talk without a deal.  He was "begging" for a deal, because he had violated probation and was told that he would be charged with murder.  Nevertheless, at the time of his statement and without any offer of a deal, Hernandez identified Barragan, Joshua, and Justin in photographic lineups.  As part of the deal he did eventually receive, he was required to testify truthfully in court.  The State asked Hernandez what would happen if he did not testify truthfully, and he responded, "I get charged for first-degree murder."

¶ 22    On cross-examination, defense counsel reviewed with Hernandez his four-page agreement with the State.  Hernandez agreed that the deal required that he testify consistently with what he told police on October 27, 2007, but that some of his testimony was not what he told police that day.  For example, at trial, he testified that the passengers wore gloves while in the SUV, but initially he did not tell that to the police.  Hernandez explained that initially he did not trust the police and did not tell them everything because he did not have a deal and that he was still a gang member at the time and the gang had rules against talking to the police.  Hernandez did not recall stealing more than one car with Barragan the night before the shooting, but he had been "high."

¶ 23    Jaime Barragan testified that he was 21 years old and, in January 2007, he was living in De Kalb.  Nevertheless, he had occasion to visit Aurora frequently, and, prior to moving to De Kalb in early 2007, he had lived in Aurora.  In 2006, Barragan became a member of the Insane Deuces.  Barragan testified to the colors and symbols used by the Insane Deuces and the Latin Kings.  He explained that the Insane Deuces and the Latin Kings were rivals and that "false flagging" means throwing up the opposing gang's sign to see if it is returned.  Barragan provided in-court identifications of Joshua and Justin and testified that they were Insane Deuces.

¶ 24    The evening of January 19, 2007, Barragan was at Caranza's apartment with Justin, Joshua, Rios, Montanez, and Hernandez.  They were partying, smoking marijuana, and drinking alcohol.  In the early morning hours of January 20, 2007, Barragan and Hernandez left the apartment, intending to steal radios.  They stole a radio and came across a running Ford Taurus.  Barragan stole the Taurus,[2] and he and Hernandez eventually left the car at another gang

---

[2] Barragan explained that stolen cars are referred to as "steamers" and are used to commit shootings and robberies.

member's house.  After leaving the car, Barragan and Hernandez went looking for more radios, but came across a running black TrailBlazer.  Barragan told Hernandez that it was his turn to steal a vehicle, but Hernandez refused.  Barragan stole the TrailBlazer and, with Hernandez riding along, drove it back to Caranza's apartment.  They went inside the apartment, saw that Joshua, Justin, and Rios were still there, and went to bed.

¶ 25    The next morning, Barragan and Hernandez told Rios about the TrailBlazer, and the three of them went outside to see it.  When they returned, Justin and Joshua were awake.  Joshua told Justin, Rios, and Barragan that he wanted to "put in work."  According to Barragan, "putting in work" means shooting someone.  They were in a bedroom, and Hernandez was in the living room.  Justin showed them that he had a gun, specifically, a .40-caliber semiautomatic, and said that "that's the gun they want to put in work with."  Barragan and Rios told the brothers about the "steamer" in the parking lot.  Hernandez confirmed that the SUV had a temporary license plate.  Later, they wanted to get something to eat and Hernandez wanted to go home, so Barragan, Joshua, Justin, and Hernandez left in the SUV.  Consistent with Hernandez's testimony, Barragan testified that he drove, Joshua sat next to him, Hernandez sat behind Joshua, and Justin sat behind Barragan.  Barragan drove to McDonald's and then into Latin Kings territory.  Hernandez spoke about wanting to get rank in the gang.

¶ 26    They wound up on High Street and saw a boy and a girl walking down a sidewalk.  The driver's side was closer to the sidewalk, and the boy was closer to the street and was wearing a hooded sweatshirt.  Justin started "gang banging with the boy," or false flagging, by saying "King love, Amore De Rey."  The boy then "represented" by throwing up the Latin Kings crown.  Barragan responded by flashing the Insane Deuces sign and saying "Deuce love, King Killer."  Barragan continued driving, turned around, and drove back down High Street such that

the passenger side was closer to the pedestrians. According to Barragan, he turned right at a stop sign and pulled into a driveway, intending to jump out to go beat up "the guy." However, he looked back and saw Justin pass Hernandez some gloves and a gun. It was the same gun Barragan saw earlier, in the apartment. Instead of getting out to "jump" the guy, Hernandez told Barragan to "drive up."

¶ 27 Barragan backed the car out of the driveway and returned to High Street, where he saw the boy and the girl "walking like right next to each other," with the boy closer to the street. He slowed the car down. When asked what he thought was going to happen at that point, Barragan responded, "I thought that most likely a shooting was going to happen." According to Barragan, Hernandez told him to slow down. Hernandez was supposed to do the shooting but Hernandez said that he "wasn't doing it" and passed the gun to Joshua. Hernandez passed the gun to Joshua between Joshua's seatbelt and the passenger door. Barragan saw Joshua with the gun; Joshua started shooting. Barragan heard three to five gunshots. The gunshots "surprised" him and he looked over and saw the boy fall. Barragan accelerated rapidly and drove away "recklessly," turning left onto Grove Street. Eventually, he stopped the car on Grove Street and used the sleeve of his hooded sweatshirt to quickly wipe down the steering wheel, the door handles, and everything he believed he had touched with his left hand (he was wearing only one glove). Further, Barragan previously had two cigars on his person and had smoked one; he tried to locate the other cigar before he left the TrailBlazer. They all exited the vehicle and split up, with Barragan and Justin jogging to Barragan's grandmother's house and then returning to Caranza's apartment. Eventually, Hernandez and Joshua arrived, and Joshua and Justin bragged to Rios about the shooting. Barragan testified that Joshua received a tattoo of a spade on his back after the shooting.

¶ 28    Barragan was asked, "[B]etween the boy and the girl, which was significant to you?"  He replied, "[T]he boy."  Asked, "I mean, were you targeting the girl at all?"  He answered, "[U]m."  Then, "[Y]ou were worried about the boy, right?"  Answer, "[Y]es, sir."  He confirmed that the girl never threw up the crown or did anything else.  They were talking about the boy while Barragan drove by and when he parked and was going to get out and beat "him" up.  Barragan testified that "the girl" (presumably, harming her) would not give him any rank in the gang.  After they turned around and returned toward the pedestrians, the boy walked toward the car while the girl was on the sidewalk; she did not come toward the car.  When the boy was shot, the girl was on the sidewalk.  Barragan did not see the gun pointed at her.

¶ 29    On October 29, 2007, Barragan was arrested in De Kalb.  He lied, telling detectives that he was in De Kalb on the day of the shooting.  Later, with his attorney, he reviewed all discovery and read every statement made by each witness in this case.  Barragan knew that he was facing a minimum of 35 years' imprisonment for the first-degree murder of Rodriguez and a minimum of 21 years' imprisonment for "the attempt first-degree murder of Claudia Lozano," which he expected would be served consecutively (for a 56-year minimum sentence).  Barragan told the State that he wished to talk, and he agreed that, when he so notified the State, he was informed that he would not receive a deal if the State did not like what he had to say.  Barragan agreed that he wanted a deal.

¶ 30    In exchange for his testimony against all codefendants, Barragan would plead guilty to attempted armed violence and aggravated battery on a public way, for a total of 18 years' imprisonment (at 50%).  Under the agreement, Barragan expected that he would have around 5 more years left to serve, which he agreed was "better than" 56 years.  Further, the State agreed to: (1) recommend that Barragan receive substance abuse treatment in prison; (2) try to get

Barragan an "S Visa" to help him with immigration issues; (3) write a letter to "ICE" to help Barragan stay in the country; (4) try to house Barragan separately from the Cavazos brothers; and (5) call the jail where Barragan was staying to check on his request to become a trustee, which would allow him to move around the jail with more freedom than a typical inmate. The agreement required that Barragan tell the truth. Barragan testified that the State decides what is truthful.

¶ 31    Finally, Barragan testified that, on March 12, 2009, he shared a cell with Montanez in the Kane County jail. Joshua was housed in the same cell block. By speaking through the ventilation system, Barragan was able to communicate with Joshua from his cell. Through the vents, Joshua told Barragan that Montanez was a "snitch" who gave evidence to the State and that they should "whoop" him. Barragan replied that it would not look good for the case. Then, Barragan and Joshua agreed to have Montanez complete an affidavit. Joshua sent an affidavit form to Barragan's cell, and Barragan gave it to Montanez. Through the vents, Montanez asked Joshua what to say, and Joshua replied, essentially, that Montanez knew what he had said and what he should write. Barragan said that the Insane Deuces do not like snitches; nevertheless, he did not threaten Montanez.

¶ 32    Eddie Montanez testified that he was serving 10 years' imprisonment for aggravated discharge of a firearm within 1,000 feet of a school. Prior to his incarceration, he lived in Aurora and was a member of the Insane Deuces. Montanez could not recall how he learned of the January 2007 shooting on High Street. He was asked whether he recalled his August 19, 2008, grand jury testimony, wherein he testified that he learned of the shooting from Joshua. Montanez replied, "[E]verything what I said at the grand jury is a lie." He apparently had told the grand jury that: (1) three days after the shooting, at Caranza's "crib" and with Justin present,

Joshua told Montanez about the shooting; (2) Joshua told Montanez that Barragan and Hernandez stole a car, that he sat in the front passenger seat while Barragan drove, and that Justin and Hernandez sat in back; (3) Joshua said that the "mission" was to look for Latin Kings; (4) Joshua saw the victim walking down the street with his girlfriend, Joshua threw up the crown, and the victim returned the crown, so Joshua shot him; and (5) as a result of the shooting, Caranza gave Joshua a spade tattoo.

¶ 33    Montanez identified Joshua and Justin in photographic lineups and, according to his grand jury testimony, identified them, respectively, as the person who shot the gun on High Street and a person who was present in the car during the shooting.  At trial, Montanez agreed that he stayed in the McHenry County jail at the same time as Joshua but said that he did not remember if, while there, they talked about the shooting.  According to Montanez's grand jury testimony, however, in the jail, Joshua told Montanez that he felt like he was going to "go down for what he did."  On March 12, 2009, Montanez signed an affidavit asserting that his grand jury testimony was a lie.

¶ 34    Wesley Grant testified that he was once a member of the Insane Deuces and he knew the Cavazos brothers.  In March 2007, at Justin's girlfriend's house, Grant had conversations with Justin and Joshua about the January shooting on High Street.  Joshua told Grant that he, Hernandez, Justin, and Barragan were riding around looking for opposing gang members.  On High Street, they saw an individual walking and they "false flagged" him, meaning that they flashed the Latin Kings sign to see how the individual would respond.  The individual threw back the sign, showing that he might be a King, so they shot him.  Grant testified that Joshua did not say who performed the false flagging or who shot the individual.  In his grand jury testimony, however, Grant stated that Joshua did tell him who shot the individual, and he agreed

that, on May 20, 2008, he identified Joshua in a photo lineup. At trial, Grant testified that Joshua had the gun.

¶ 35    Grant agreed that, in October 2007, he was charged with possession of a stolen motor vehicle and attempted armed robbery. He knew that he could receive up to 7 years' imprisonment for the possession of a stolen vehicle and another 15 years' imprisonment for the attempted armed robbery, sentences that could possibly run consecutively. When, in October 2007, the police asked Grant whether he knew anything about the shooting on High Street, he did not tell them everything he knew, because he was not represented by an attorney. He did, however, tell them at that time that Joshua was the shooter and that, when the car, full of Insane Deuces, passed the victim, they threw up the crown. In May 2008, with an attorney present, he spoke with the police. In August 2008, he testified before the grand jury in Joshua's case, and in December 2008, he pleaded guilty to the pending charges against him, receiving only four years' imprisonment on each, to run concurrently.

¶ 36    Miguel De La Cruz testified that he was currently being housed in the Kane County jail on charges of aggravated unlawful use of a weapon, two counts of first-degree murder, attempted first-degree murder, and four counts of aggravated battery with a firearm. He testified that he did *not* have an agreement with the State to testify in Joshua's case. In January 2007, De La Cruz was a member of the Latin Kings. The Kings and the Insane Deuces were rivals and "worked" to shoot and cause harm to one another. It would not be safe for members of one gang to walk in the area of a rival gang, and one of the few reasons for members of the Insane Deuces to be walking or driving in Latin Kings territory would be to look for somebody to shoot. De La Cruz testified that the area of High and Grove Streets in Aurora is considered Latin Kings territory.

¶ 37    De La Cruz read in the newspaper about the January 20, 2007, shooting on High Street.

In January 2007, there was a courtroom on the second floor of the Aurora police department. Sometimes gang members would be there for their own or other members' cases. On those occasions, De La Cruz would sometimes see rival gang members. A few weeks before March 2007, he was standing outside the courtroom with three other Latin Kings members, when he encountered members of the Insane Deuces. Both groups began flashing gang signs and shouting derogatory gang slogans at each other. According to De La Cruz, he and one of the Insane Deuces "got into like a little argument and stuff," and the Insane Deuces member asked De La Cruz if he remembered what happened on High Street. De La Cruz responded that he remembered, and the Insane Deuces member "said that High Street was his." In addition, the Insane Deuces member showed that there was a spade on his right hand. De La Cruz took the comment to mean that the Insane Deuces member was claiming responsibility for the shooting on High Street. He later identified Joshua in a photo lineup as the person he encountered outside the courtroom.

¶ 38    Ignacio Rios, 23 years old, testified that he was born in Mexico and currently lived there. He came to the United States when he was six years old and returned to Mexico about three years prior to trial. Because Rios was a deported convicted felon, the State's Attorney's office and the Aurora police department worked with Homeland Security to obtain Rios's presence at trial. On January 20, 2007, Rios lived in Aurora and was a member of the Insane Deuces. He was at Caranza's apartment and was smoking marijuana. Rios had a conversation with Joshua, Justin, Hernandez, and Barragan. Justin displayed a .40-caliber silver semiautomatic handgun. Barragan and Justin spoke about finding a Latin Kings member to shoot. Joshua, Justin, Hernandez, and Barragan left the apartment, and Rios stayed in the apartment with Caranza. Rios and Caranza turned on a police scanner so they could hear if a shooting took place. Later,

when the four men returned to the apartment, Hernandez stood to the side and did not actively participate in the conversation with the others. Joshua was acting happy and said that he wanted to change his name to "Whacko" because he "just whacked a King." Justin was acting excited too and was throwing up the crown and kissing it like he did when he was false flagging.

¶ 39    Rios was arrested in October 2007, and he was charged with attempted robbery and attempted unlawful possession of a motor vehicle. He gave a statement to police, hoping to get those charges dropped. In the statement, he said that, during the High Street shooting, Barragan was driving, with Justin in the front seat and Joshua and Hernandez in the back. At trial, he testified that he knew Barragan was the driver, but he was not positive where the others were sitting, because he was not there. Before the shooting, there was no discussion about who would be the shooter. When they returned, there was discussion about Hernandez "punking out." Rios told the grand jury that, upon their return to the apartment, the men were talking about how Justin saw a "guy" while they were driving by on High Street and Justin threw up the crown at him. They drove by again and Justin was going to shoot, but instead he gave the gun to Hernandez, who did not want to do it either. Hernandez gave the gun to Joshua. Rios confirmed that, when the men returned to the apartment, they discussed that Joshua was the shooter. Rios said that Joshua told him that he jumped out of the SUV to do the shooting. Barragan, Joshua, and Justin were excited and bragging, but Hernandez was not.

¶ 40                    2. Officers' Testimony

¶ 41    Detective Angel Nieves testified that he investigated the High Street shooting. On October 23, 2007, when the police were interviewing him on unrelated charges, Rios gave them a lead about the High Street shooting. Upon review of four different photo arrays, Rios identified: (1) Joshua as the person who shot Rodriguez; (2) Barragan as the person who stole

and drove the vehicle used in the shooting; (3) Justin as the individual who, just before the incident, displayed a handgun and, later, produced in the vehicle the handgun that was used in the shooting; and (4) Hernandez as having been present with the three other individuals in the vehicle during the shooting. On October 27, 2007, Nieves interviewed Hernandez and showed him multiple photo arrays. Hernandez identified Joshua as the person who shot Rodriguez, Justin as the person who provided the handgun that was used in the shooting, and Barragan as the driver of the stolen vehicle used in the shooting.

¶ 42    On November 2, 2007, Nieves interviewed Montanez at the McHenry County jail; he showed Montanez four photo arrays. Montanez identified Joshua and explained to Nieves that Joshua had admitted to him that he shot Rodriguez. Montanez identified Justin as having been with Joshua at the time of the shooting. In addition, on May 20, 2008, Nieves interviewed Grant at the Kendall County jail and showed him a photo array. Grant identified Joshua and told Nieves that Joshua had admitted to Grant that he shot Rodriguez.

¶ 43    Joseph Accardi testified that he was employed by the Aurora police department and that, on March 29, 2007, he spoke with De La Cruz and showed him a photo array. De La Cruz identified Joshua as the person near the courtroom who had boasted that he did the High Street shooting.

¶ 44    Before trial, the State had moved *in limine* to introduce gang expert testimony through Sergeant Jeffrey Wiencek. The court granted the motion, primarily on the basis that the expert's testimony might aid the jury's understanding of an otherwise unexplainable act.

¶ 45    At trial, Wiencek testified that, in Aurora, gangs typically create symbols and slogans to identify themselves. For example, the Insane Deuces use the slogans "Deuce Love" and "Amor De Deus," and they use a hand signal that looks like an exaggerated peace sign. The Latin Kings

use the slogans "King Love" and "Amor De Rey," and they use a hand signal that resembles a three-point crown. Further, each gang wears different colors: black and green for the Insane Deuces and black and gold for the Latin Kings.

¶ 46    Street gangs in Aurora are classified into two umbrella organizations. The "People Nation" includes the Latin Kings, and the "Folk Nation" includes the Insane Deuces. They do not get along. Although gang members typically display their gang signs to other members to signify their membership in that gang, on "very, very rare" occasions gang members use a sign of another gang. For example, to show disrespect for the Latin Kings, an Insane Deuces member might exhibit the Latin King sign upside down. Also, an Insane Deuces member might use the Latin King sign when "false flagging." False flagging is:

> "basically baiting another gang to figure out if a person is going to be a member of that street gang; and then what they could do is they could throw up the rival gang's hand sign to see if that member would then throw it back to them. If they do, they can then confirm their gang affiliation; and then based upon that, they could decide what's going to happen afterwards. It could be a beat-down, it could be a shooting, it could be other things."

¶ 47    Wiencek further testified that the gangs claimed territories within Aurora and that, in 2007, the area of High Street and Grove Street was "definitely the Latin King territory." Wiencek explained that, generally, gang activities are aimed at helping the gang flourish. For example, gang members commit robberies and sell drugs to acquire money for the gang. To protect gang territory, members acquire guns and go "hunting" for rivals. "Hunting" is actively searching for rival gang members to hurt or kill. The purpose behind hunting is to: (1) take out enemies who are hunting members of one's own gang; (2) hold territory by showing the rival gang that one's own gang is strong; (3) show the rival gang the location and boundaries of one's

own gang's territory; and (4) show members of one's own gang that he or she is "down for the cause" or has love for and commitment to the gang. Wiencek testified that gang members often wear gloves to avoid leaving evidence, such as fingerprints or DNA, behind at a crime scene. In addition, gangs in Aurora operate with a "code of silence," where gang activities are not shared with people outside of the gang or with law enforcement. That code is sometimes broken and, as a consequence, the code violator is kicked out of the gang and might be threatened or treated with violence.

¶ 48    The Aurora police department gathers information about street gangs and prepares reports, classifying gang affiliates as either members, associates, or "others." "Others" is a default category encompassing persons who might be involved in some form of gang activity. "Associates" are persons with whom the police have had at least one contact, with the presence of two or more criteria (for example, wearing gang colors, wearing clothing in a manner indicative of gang involvement, using gang slogans, etc.). Individuals are classified as "members" by personal admission, by gang tattoos on their bodies, or if, within a one-year period, the police have three contacts, with two or more criteria present. Through his professional experience in the Aurora police department's gang unit, Wiencek knew that, in 2007, Carranza was classified as an Insane Deuces member who owned an apartment that was used as a gang hangout and a base for missions. In addition, Justin and Joshua were Insane Deuces members. Wiencek was aware that Joshua had two tattoos of spades, the primary symbol of the Insane Deuces, one on his right hand on or between his fingers, and a large one on his back. Wiencek identified photographs thereof and testified that the police first observed the tattoo on Joshua's hand in 2005 or 2006 and first noticed the tattoo on Joshua's back around May 2007. When asked if he had any doubt that Justin was an Insane Deuces member, Wiencek

replied, "none." Justin had numerous contacts with the police department between February 2006 and July 2007, was found in Insane Deuce hangouts, was in the presence of numerous gang members, wore the gang's colors, and admitted to Officer Jay Ellis that he was an Insane Deuces member. Finally, Wiencek testified that Rodriguez was not classified as a street gang member but that he was affiliated with the Latin Kings and his older brother was a Latin Kings member.

¶ 49    The State rested. The court denied Joshua's motion for a directed verdict.

¶ 50                    B. Defense Case, Rebuttal, Closing, and Instructions

¶ 51    Nieves testified that, when he interviewed Hernandez in October 2007, Hernandez stated that he did not want to be a "snitch" unless he was guaranteed a deal. Nevertheless, Nieves testified, that day Hernandez was not offered a deal, he talked without a deal, and, despite talking, he was taken into custody. Nieves testified that Hernandez did not immediately recognize the SUV from a photograph; however, Hernandez did recognize it when shown a photo of the back of the car with the temporary plate and dealership decal.

¶ 52    Vicki Lefter Dieter testified that, on January 20, 2007, she was driving and turning left onto Grove Street in Aurora when she and her sister "could have died in a very bad accident because the driver of the car was going at a high rate of speed, and he didn't stop at his stop sign. He just proceeded through it going as fast as he could get the vehicle to move." The car was a large, new, black SUV. The driver was a "large female with a lot of hair" and was Hispanic. At trial, Dieter remembered that the driver was wearing glasses and had long hair that was pulled up and hanging; "you could see that she had used a product on her hair. Her hair was shiny, and you could just tell when somebody is using a product on their hair." The driver was dressed in dark clothing, which Dieter believed was a black coat. Dieter also saw a small-framed Hispanic man in the front passenger seat. She did not see anyone else in the car. Dieter continued driving

and saw a boy lying on the street and a girl trying to revive him. Dieter told her sister to call 911, and she got out of the car to help. Police arrived and, ultimately, took Dieter down Grove Street to identify a car. The car looked like the one that almost struck her in the intersection.

¶ 53    Dieter agreed that, because the car was going extremely fast and "blew through" a stop sign, she had only a split second to look at the driver. She did not recall telling an officer immediately after the incident that she saw only a Hispanic male in the speeding car. She did not recall telling officers that the driver had shoulder-length hair with possible curls or a coarse look. Joshua rested.

¶ 54    On rebuttal, the State called Officer Richard Galarza, who testified that, on January 20, 2007, he interviewed Dieter near the intersection of High and Grove Streets. She told him that the driver of the vehicle had shoulder-length, possibly curly or coarse hair. In addition, she stated that she saw only one person in the car, the driver. She did not mention seeing a Hispanic male in the car.

¶ 55    In closing argument, the State emphasized that the jury should read the jury instructions because "[t]hey are very important in this case. Every word of every instruction is there for a reason." In addition, the State mentioned that Joshua fired the gun, killing Rodriguez and hitting Lozano. Further, the State noted that Rodriguez was hit three times and Lozano was hit once in her leg. Finally, as to attempted murder, the State argued:

> "the evidence we've already talked about supports the attempted murder as well. The
>
> defendant fired shots in the direction of both Oscar and Claudia. He had specific intent to
>
> kill both. He successfully completed the killing of Oscar. He did not successfully
>
> complete the killing of Claudia. He took a substantial step though by shooting and by

hitting her with the bullet on her thigh. Although she was not seriously injured, we know from the facts that the defendant tried to kill her as well."

¶ 56 The court instructed the jury that neither opening nor closing statements are evidence. As to attempted murder, the jury was instructed:

"A person commits the offense of attempt first degree murder when he, without lawful justification and with the intent to kill *an individual*, does any act which constitutes a substantial step toward the killing of *an individual*. The killing attempted need not have been accomplished. To sustain the charge of attempt first degree murder, the State must prove the following propositions:

First proposition: That the defendant, or one for whose conduct he is legally responsible, performed an act which constituted a substantial step toward the killing of *an individual*; and

Second proposition: That the defendant, or one for whose conduct he is legally responsible, did so with the intent to kill *an individual*." (Emphases added.)

¶ 57 In contrast, the jury was informed that, to convict Joshua of murder, it had to find that Joshua performed the acts "which caused the death of Oscar Rodriguez."

¶ 58                 C. Jury Verdict and Sentence

¶ 59 The jury convicted Joshua of two counts of first-degree murder and found that he personally discharged the firearm that proximately caused Rodriguez's death. The jury also convicted Joshua of attempted first-degree murder and found that he personally discharged the firearm used in that crime. Finally, the jury found Joshua guilty of aggravated discharge of a firearm and unlawful possession of a stolen motor vehicle.

¶ 60    The court denied Joshua's motion for a new trial.  The court considered mitigating and aggravating evidence and found that Joshua "decided in his very young life to choose the Insane Deuces" over his freedom.  The court sentenced Joshua to 25 years' imprisonment for first-degree murder (see 730 ILCS 5/5-8-1(a)(1)(a) (West 2006) (providing range of 20 to 60 years)), with a 25-year add-on for personally discharging the firearm that caused the death (see 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2006) (add-on may be 25 years to natural life)).  The court sentenced Joshua to 10 years' imprisonment for attempted first-degree murder (see 730 ILCS 5/5-8-1(a)(3) (West 2006) (providing range of 6 to 30 years)), with a 20-year add-on for personally discharging the firearm (see 730 ILCS 5/5-8-1(a)(1)(d)(ii) (West 2006)).  The murder and attempted-murder sentences are to be served consecutively (see 730 ILCS 5/5-8-4(d) (West 2006)).  Finally, the court sentenced Joshua to three years' imprisonment for possession of a stolen motor vehicle (see 730 ILCS 5/5-8-1(a)(5) (West 2006) (providing range of three to seven years)), to run concurrently with the attempted-murder sentence.

¶ 61    Joshua moved to reconsider the sentences, asking that the court grant the minimum aggregate sentence (which in these circumstances was 71 years' imprisonment) rather than the 80 years imposed.  The court granted the motion in part, reducing the murder sentence by 5 years (*i.e.*, to the minimum of 20 years), resulting in an aggregate sentence of 75 years' imprisonment.  Joshua appeals.

¶ 62                                II. ANALYSIS

¶ 63                         A.  Sufficiency of the Evidence

¶ 64    Joshua argues first that the evidence was insufficient to sustain any of his convictions.  He asserts that no physical or other evidence directly linked him to the shooting and that Lozano, the only eyewitness, could not identify anyone in the SUV.  Instead, Joshua argues, the evidence

against him came from convicted felons who agreed to implicate him only after they were arrested for other offenses and threatened with murder charges. Joshua notes that Barragan made his statements to police after the State charged him with murder and offered an extremely generous plea agreement. Similarly, Hernandez "begged" for a deal and received a generous agreement in exchange for his testimony. Both Barragan and Hernandez admitted that they were using drugs at the time of the incident and were inconsistent in their accounts of the shooting itself. For example, Hernandez claimed that Justin false flagged Rodriguez with a Latin Kings gang sign and Barragan said that Justin flashed the Latin Kings sign and used the slogans "King love, Amor De Rey," while Lozano testified that someone in the SUV yelled "Deuce love, King killer." Further, while Barragan said that he pulled the SUV into a driveway and was going to get out to beat up Rodriguez but drove back at Hernandez's instructions, Hernandez said that they immediately drove past Rodriguez after turning around and he denied giving instructions to Barragan. Finally, Lozano testified that someone was hanging out of the rear passenger window and recalled that person as having the gun, but Hernandez, who was in that seat, denied doing so. Joshua concludes that Rios, Grant, Montanez, and De La Cruz were similarly incredible due to their motives to lie to law enforcement, admitted lies to law enforcement, and drug use. We disagree.

¶ 65     When reviewing a challenge to the sufficiency of the evidence, the standard of review is whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007). It is the jury's function to determine witness credibility, weigh and resolve conflicts in the evidence, and draw reasonable inferences therefrom. *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001). "[D]ue consideration must be given to the fact that it was the trial court and

jury that saw and heard the witnesses." *Wheeler*, 226 Ill. 2d at 114-15.  Accordingly, we will not substitute our judgment for that of the trier of fact (*Ortiz*, 196 Ill. 2d at 259), and we will reverse a conviction only where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt as to the defendant's guilt (*Wheeler*, 226 Ill. 2d at 114).

¶ 66    Here, Joshua's argument, which rests almost entirely on the credibility of the witnesses against him, must fail.  The witnesses' criminal histories, their agreements with the State, and their general motivations to curry favor with the State were thoroughly exposed at trial.  Defense counsel cross-examined each witness about these details and argued to the jury that the witnesses had strong motivations to lie, and the jury was instructed that it should view testimony from codefendants with due skepticism.  There is no question that the witnesses, particularly Barragan, benefitted greatly from their willingness to testify against Joshua.  However, as Joshua acknowledges, the fact that a witness has been promised leniency in exchange for testimony does not automatically raise doubt as to the defendant's guilt.  *People v. Roy*, 172 Ill. App. 3d 16, 22 (1988).  Even though the primary witnesses against Joshua were gang members who benefitted from providing testimony, "the jury heard the testimony of each of these witnesses, was made aware of the infirmities in each witness's testimony[,] and chose to believe these witnesses.  We cannot now substitute our judgment for that of the trier of fact."  *People v. Thompson*, 313 Ill. App. 3d 510, 520 (2000).  We note, too, that Hernandez and Barragan arguably had motives *not* to lie, as they testified that their agreements with the State required that they tell the truth to receive the benefit of their bargains.  The jury, as it was completely aware of the weaknesses in the witnesses' testimony, was entitled to find the evidence credible in its totality.  *In re Jonathon C.B.*, 2011 IL 107750, ¶ 60 (trier of fact need not believe every piece of evidence, but need find only that the evidence taken together establishes guilt beyond a reasonable doubt).

¶ 67    Further, the jury could have reasonably found that the inconsistencies between the witnesses' testimony were minor in comparison to their overall consistency.  We simply disagree with Joshua that the testimony differed "dramatically."  Indeed, the witnesses were, essentially, consistent in their testimony: (1) regarding their description of the vehicle and the weapon used in the shooting; (2) regarding the identities of the vehicle's passengers and their locations inside the vehicle; (3) that gang symbols or slogans were exchanged before the shooting; (4) that Justin provided the gun, Hernandez refused to shoot, and Joshua wound up with the gun; (5) that Joshua shot the victims; and (6) that Joshua took credit for the shooting and received a spade tattoo as his reward.

¶ 68    Finally, we note that Joshua's fingerprint was found on a cigar wrapper recovered from the SUV.  Joshua argues that this is not necessarily indicative of guilt, because it is unknown *when* his fingerprint got on the wrapper.  However, Barragan testified that the cigar was on his person when he got in the SUV and that he looked for it after the shooting.  Briesca testified that the cigar was not in his SUV when it was stolen, and the cigar was found in the cup holder near the passenger side of the vehicle, where Joshua was allegedly sitting.  As such, the jury could have reasonably found, in light of the evidence in its entirety, that Joshua's fingerprint on the wrapper placed him in the SUV at the time of the shooting and, further, that it corroborated the witnesses' testimony regarding his presence and location in the vehicle.  We also note that, despite his contention, the cigar wrapper was not the only evidence that corroborated the witnesses' testimony about the events.  Four .40-caliber casings were found at the scene (corroborating that a .40-caliber "nation gun" was used), the recovered SUV matched almost exactly the description given by all witnesses, including Lozano, Rojo, and Dieter, and photographs of a large spade tattoo on Joshua's back, which police did not notice in 2006 but did

see in May 2007, corroborated the witnesses' testimony that Joshua received the tattoo because he committed the shooting. Joshua argues that none of the foregoing evidence directly links *him* to the shooting. The question, however, is whether the evidence, viewed in its totality and in the State's favor, was sufficient for the jury to find him guilty. Simply put, viewed in the light most favorable to the State, the evidence was more than sufficient for the jury to find Joshua guilty beyond a reasonable doubt.

¶ 69                         B. Attempted-Murder Jury Instruction

¶ 70    Joshua argues next that his right to a properly instructed jury was violated where the attempted-murder instruction stated that the jury could find Joshua guilty if it found that he intended to kill "an individual" but not, specifically, that he intended to kill Lozano. The court gave the pattern jury instruction for attempted murder. Illinois Pattern Jury Instructions, Criminal, No. 6.07X (4th ed. 2000). Joshua argues that, although the State had to prove that he specifically intended to kill Lozano, the pattern instruction relieved the State of its burden of proof because the jury could have found him guilty based not on a finding that he specifically intended to kill Lozano but, rather, on an intent to kill *any* individual, including Rodriguez. In other words, Joshua argues, the instruction permitted the jury to find him guilty of both murder and attempted murder based solely on the shooting of Rodriguez. Joshua argues that the erroneous instruction created a serious risk that he was incorrectly convicted of attempted murder because the jury did not understand the applicable law, thus threatening the fairness of his trial. Joshua requests that we review this issue for plain error, as it was not raised below. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (failure to object at trial and in a posttrial motion generally results in forfeiture of the issue for review). Alternatively, he argues that his counsel was ineffective for failing to raise this issue below.

¶ 71     Plain-error review permits us to consider a forfeited claim of clear error where the evidence is so closely balanced that the error alone might have resulted in the defendant's conviction, or where, regardless of the closeness of the evidence, the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process. *People v. Sargent*, 239 Ill. 2d 166, 189 (2010).   The plain-error clause of Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967) (any error that does not affect substantial rights shall be disregarded; plain errors affecting substantial rights may be noticed even if not brought to the trial court's attention) is co-extensive with and interpreted identically to Illinois Supreme Court Rule 451(c) (eff. July 1, 2006) ("substantial defects" in criminal jury instructions "are not waived by failure to make timely objections thereto if the interests of justice require").  *Sargent*, 239 Ill. 2d at 189.   Plain-error review first requires consideration of whether error occurred.  *People v. Herron*, 215 Ill. 2d 167, 184 (2005); see also *People v. Hillier*, 237 Ill. 2d 539, 545 (2010).

¶ 72     In considering Joshua's argument that giving the pattern instruction constituted error, we remain mindful that "Supreme Court Rule 451(a) requires that in a criminal case, if the court determines the jury should be instructed on a subject, and the Illinois Pattern Jury Instruction (IPI), Criminal, contains an applicable instruction, then the IPI instruction 'shall' be given unless the court determines it does not accurately state the law." *People v. Hopp*, 209 Ill. 2d 1, 7 (2004).  "Illinois pattern instructions have been painstakingly drafted" and "[t]rial judges should not take it upon themselves to second-guess the drafting committee where the instruction in question clearly applies."  (Internal quotation marks omitted.)  *People v. Durr*, 215 Ill. 2d 283, 301 (2005).  Thus, the trial court is "allowed to deviate from the suggested instruction and format only where necessary to conform to unusual facts or new law."  (Internal quotation marks omitted.)  *People v. Anderson*, 2012 IL App (1st) 103288, ¶ 40.

¶ 73    Nevertheless, the purpose of jury instructions is to inform the jury of the correct principles of law applicable to the evidence, and, therefore, the instructions should not be misleading or confusing.    Whether an instruction is correct depends on whether "ordinary persons acting as jurors would fail to understand them."    *Herron*, 215 Ill. 2d at 187-88.    A defendant claiming an instructional error need not prove that the instructional error actually misled the jury (*id.* at 193), but he or she must show that the claimed error "creates a serious risk that the jurors incorrectly convicted the defendant because they did not understand the applicable law, so as to severely threaten the fairness of the trial."    *Hopp*, 209 Ill. 2d at 8; see also *People v. Young*, 2013 IL App (2d) 120167, ¶ 20.

¶ 74    Based on the foregoing, we are asked to consider whether: (1) giving the attempted-murder pattern instruction constitutes error because the facts required a deviation from the instruction; and (2) if so, whether the error created a serious risk that the jury convicted Joshua of attempted murder because it did not understand the applicable law, thus depriving him of a fair trial.

¶ 75    We reject Joshua's arguments and note that, after briefing in this case was finished, this court, in *People v. Salazar*, 2014 IL App (2d) 130047, ¶¶ 59-65, rejected the same arguments Joshua raises here.    For example, in support of his position, Joshua relies on *Anderson*, where the defendant was charged with first-degree murder of one victim (Hart) and attempted first-degree murder of a second victim (Hazziez).    *Anderson*, 2012 IL App (1st) 103288, ¶ 1.    The charges arose from an incident wherein at a restaurant Hazziez witnessed an argument between the defendant and Hart.    Outside the restaurant, Hazziez saw the defendant shoot Hart.    Hazziez, who was about 10 feet away from the defendant at the time of the shooting, "took off in his car" and heard three more gunshots.    *Id.* ¶ 7.    He was not sure in which direction the shots were fired.

The only other eyewitness testified that the defendant fired at "another man, who had been in the restaurant and who had been standing outside when defendant" shot the victim. *Id.* ¶ 15. There were no bullet holes in Hazziez's car.

¶ 76     At trial, the jury was given the attempted-murder pattern instruction, which stated that, to find the defendant guilty of attempted murder, it had to find that he intended to kill "an individual" and that he took a substantial step toward the killing of "an individual." (Emphasis and internal quotation marks omitted.) *Id*. ¶ 24. It convicted the defendant of both attempted murder and murder. On appeal, the court held that, "under the narrow set of facts of this case," the trial court's attempted-murder instruction, which instructed the jury that the subject of the attempted murder was "an individual" rather than Hazziez specifically, constituted plain error. *Id*. ¶ 64. The court agreed with the defendant that the jury could have found him guilty of the attempted murder of Hart, rather than of Hazziez, because an "ordinary person" in the jury would probably not understand that the subject of the attempted-murder charge was *only* Hazziez. *Id*. ¶ 61. Although the trial court informed the jury prior to trial that the attempted-murder charge pertained to Hazziez, and although the State also informed the jury as such in closing arguments, the appellate court did not find this to cure the error, because the jury was also instructed that the indictment and closing arguments were not evidence. *Id.* ¶ 62. The court held that the evidence regarding the attempted murder of Hazziez was closely balanced, particularly given that no witness testified that the defendant actually shot at Hazziez, and, so, the court reversed and remanded for a new trial on the attempted-murder charge. *Id.* ¶¶ 65-67.

¶ 77     The State disagrees that *Anderson* is applicable, and it relies instead on *People v. Malone*, 37 Ill. App. 3d 185 (1976). In *Malone*, the defendant fired two shots at a group and injured a victim. Later, when a police officer went to arrest the defendant, he fired two shots at the officer.

The defendant was charged with attempted murder of the victim and aggravated assault of the officer. At trial, the pattern instruction, permitting conviction if the jury found attempted murder of "an individual," was provided. *Id.* at 190.

¶ 78    On appeal, the court rejected the defendant's argument that the instruction should have specified that the victim, *not* the officer, was the subject of the attempted-murder charge. *Id.* at 190-91. Noting that the pattern instruction should be modified only where the facts make it inadequate, that the name of the victim is not an element of the offense, and that the instruction does not leave a place for the victim's name, the court found simply that the jury understood that the officer was not the subject of the attempted-murder charge and held that reversal was unnecessary. *Id*. at 191.

¶ 79    As we did in *Salazar*, we disagree with Joshua that *Anderson* renders the instruction here erroneous. We find *Anderson*, which, again, found error based on the "narrow set of facts" before it, distinguishable. *Anderson*, 2012 IL App (1st) 103288, ¶ 64. The *Anderson* court held that, when the pattern instruction was given, it was "probable" that the jury did not understand that the subject of the attempted-first-degree-murder charge was only Hazziez, which the trial court could have easily clarified. *Id.* ¶ 61. We disagree, however, that *Anderson* should be interpreted as holding that, anytime the subject of an attempted murder is not the subject of another charge, juror confusion is "probable" and the pattern instruction must be modified. Indeed, although the court first found error and then found that the evidence was closely balanced, we nevertheless believe that the court's entire analysis was shaped by the fact that the evidence was closely balanced. That evidence was unclear whether there even *was* a victim other than Hart. As such, when considering whether the lack of specificity in the instruction

could have caused the jury to misapply the law, the court concluded that, given the evidence and "narrow set of facts before it" (*id.* ¶ 64), confusion was "probable" (*id.* ¶ 61).

¶ 80    Here, in contrast, Joshua's argument that the jury could have convicted him based on a misunderstanding of the law is speculative.  Therefore, we do not think that juror confusion here was "probable."  Unlike in *Anderson*, the evidence here left no question as to whether shots were fired in Lozano's direction.  Indeed, Lozano testified that she was next to Rodriguez when he was shot and that she was shot in the leg.  There were only two people on the sidewalk when Joshua opened fire: one died, and one was injured.  As in *Malone*, we do not believe that the evidence could have confused the jury as to who was the subject of the attempted-murder charge such that the trial court erred by not deviating from the pattern instruction.  Again, the court should deviate from the pattern instruction only where necessary to conform to unusual facts or new law.  We disagree that either existed here.

¶ 81    Further, while Joshua does not have to show that the jury was actually misled, he needs to show that there is a "serious risk" that he was convicted because the jury did not understand the applicable law.  Viewed as a whole, the record belies any such serious risk.   Initially, the trial court and the State informed the jury that Joshua was charged with the murder of Rodriguez and the attempted murder of Lozano.  In closing, the State specified that the attempted-murder charge pertained to Lozano.  We acknowledge that similar "clarifications" were rejected by the *Anderson* court on the basis that the jury was also informed that the indictment and the closing arguments are not evidence (*id.* ¶ 62), but we respectfully disagree that this is in any way dispositive.  The question is whether there exists a serious risk that the jury instruction misled the jury, such that it convicted Joshua based on a misunderstanding of the law.  *Hopp*, 209 Ill. 2d at 8.  Whether evidence or not, the clarifications at the opening and at the close of trial provided

explanation or guidance that informed the jury before its deliberations (again, on an issue that was not disputed by the defense). Thus, we conclude that Joshua's plain-error claim fails.

¶ 82    For similar reasons, Joshua's alternative argument, that his counsel was ineffective for not challenging the attempted-murder instruction, also fails. An ineffective-assistance claim requires a defendant to show that his or her counsel's performance was objectively unreasonable (performance prong) *and* a reasonable probability—sufficient to undermine confidence in the outcome—that, but for counsel's errors, the jury's verdict would have been different (prejudice prong). *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984). To succeed on the ineffective-assistance claim, both prongs must be satisfied. *Id.* at 687; *People v. Williams*, 181 Ill. 2d 297, 320 (1998). Here, we have determined that the pattern jury instruction was properly provided to the jury. As such, counsel's failure to argue otherwise was not objectively unreasonable, and the ineffective-assistance claim fails. See *People v. Phipps*, 238 Ill. 2d 54, 65 (2010); *People v. Lewis*, 88 Ill. 2d 129, 156 (1981*)* (counsel is not required to raise losing arguments to avoid an ineffective-assistance claim).

¶ 83              C. Evidence of Specific Intent for Attempted Murder

¶ 84    Next, Joshua argues (separately from his general sufficiency argument, which we rejected above) that his attempted-murder conviction must be reversed because there was no evidence presented that he specifically intended to kill Lozano. Joshua argues that attempted murder is a specific-intent crime but that the only evidence presented reflected an intent to kill a rival gang member and, specifically, "the boy" who was wearing gang colors and returned the Latin King sign. Further, he argues that we should find that the doctrine of transferred intent does not apply and therefore cannot cure the State's lack of evidence regarding a specific intent to kill Lozano. Joshua concludes that the evidence supported only that his knowing discharge of a firearm in

Lozano's direction constituted aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2006)), of which the jury also found him guilty.

¶ 85    Preliminarily, we agree with the State that the doctrine of transferred intent is not at issue here and, therefore, we need not resolve its applicability to inchoate offenses. Transferred intent generally concerns an *unintended* victim, such that the actor's intent to injure or kill one person may be transferred to a different victim who was injured or killed. See *People v. Migliore*, 170 Ill. App. 3d 581, 589 (1988). Here, the State did not pursue a theory at trial that Joshua's intent to kill Rodriguez transferred to Lozano, who was an unintended victim. Rather, the State maintained that Joshua *also* intended to kill Lozano. The question is simply whether the evidence was sufficient for the jury to find, beyond a reasonable doubt, that Joshua *also* intended to kill Lozano.

¶ 86    Joshua's argument regarding transferred intent is premised on his belief that there was no evidence that he intended to kill Lozano (such that, he concludes, he was convicted by virtue of transferred intent only). However, we disagree with his premise. It is fair to say that the evidence speaking to Joshua's intent to kill Lozano was not as detailed as that supporting his intent to kill Rodriguez. As Joshua points out, the witnesses testified that they were "hunting," looking to shoot a rival gang member. They testified that the rival gang member they found was a "he" and that "he" was walking with a girl. Rodriguez was the person wearing gang colors and who returned the gang sign, signifying himself as a Latin King. Barragan testified that Justin was "gang banging with the boy" and that he intended to get out of the car to beat up "the guy." Further, according to Barragan, between the boy and the girl, the boy was the one who was significant, and harming the girl would not necessarily provide any clear reward within the gang

in terms of rank or otherwise. Barragan did not see the gun pointed at Lozano, and he testified that, when Rodriguez was shot, he was closer to the street and Lozano was still on the sidewalk.

¶ 87 However, we are mindful that our standard of review requires us to consider the evidence in the State's favor, to not substitute our judgment for that of the trier of fact, and to question whether any rational trier of fact could have found beyond a reasonable doubt that Joshua intended to kill Lozano. *Wheeler*, 226 Ill. 2d at 114; *Ortiz*, 196 Ill. 2d at 259. As such, for the following reasons, we conclude that Joshua's attempted-murder conviction must be affirmed.

¶ 88 Where a defendant is charged with attempted murder, the State must prove beyond a reasonable doubt that the defendant intended to kill the victim and that he or she took a substantial step toward doing so. 720 ILCS 5/8-4(a), 9-1(a)(1) (West 2006); *Migliore*, 170 Ill. App. 3d at 586. Here, Joshua challenges the State's proof regarding only the intent element. An intent to kill is rarely demonstrable through direct evidence and may, therefore, be inferred from surrounding circumstances, such as the "character of the assault, the use of a deadly weapon, and the nature and extent of the victim's injuries." *People v. Teague*, 2013 IL App (1st) 110349, ¶ 24; see *Migliore*, 170 Ill. App. 3d at 586. Further, "[s]uch intent may be inferred if one wilfully does an act, the direct and natural tendency of which is to destroy another's life." *Migliore*, 170 Ill. App. 3d at 586. Finally, "[i]t is the function of the trier of fact to determine the existence of the requisite intent, and that determination will not be disturbed on review unless it clearly appears that there exists a reasonable doubt as to the defendant's guilt." *Id.*

¶ 89 Here, although the evidence speaks more directly to Joshua's intent to kill Rodriguez, there nevertheless clearly exists sufficient evidence from which the jury could have reasonably found that Joshua *also* intended to kill Lozano. Again, the jury heard evidence regarding the circumstances of the shooting, which included that the vehicle drove up close to the victims, who

were walking right next to each other, and that Joshua fired at least four rounds from a .40-caliber semiautomatic weapon. See *Teague*, 2013 IL App (1st) 110349, ¶ 25 (evidence of intent to kill sufficient where the defendant fired, from a distance of 40 feet, a semiautomatic weapon at three police officers sitting in a vehicle, even though there was no damage to the vehicle except the windshield and no officer was injured). Thus, the evidence reflects that Joshua pointed the gun in the direction of two people standing together and fired four shots at relatively close range. Lozano was, in fact, shot in the leg. "The very fact of firing a gun at a person supports the conclusion that the person doing so acted with an intent to kill." (Internal quotation marks omitted.) *Teague*, 2013 IL App (1st) 110349, ¶ 26 (quoting *People v. Ephraim*, 323 Ill. App. 3d 1097, 1110 (2001)); see also *People v. Garcia*, 407 Ill. App. 3d 195, 201-02 (2011) (intent to kill reasonably inferred from firing two bullets in the direction of an occupied car and crowded street); *People v. Bailey*, 265 Ill. App. 3d 262, 273 (1994) (intent to kill reasonably inferred from shooting down a breezeway in which several people were running).

¶ 90    Further, there exists other evidence in the record from which the jury could have found an intent to kill Lozano or, at least, from which it could have discounted testimony suggesting that she was not a target. For example, although Barragan testified that he did not see the gun aimed at Lozano, he also testified that the gunshots surprised him and he was focused on driving away "recklessly." Although Barragan claimed that, during the shooting, Rodriguez had stepped forward toward the SUV and Lozano was still on the sidewalk, Hernandez testified that, after the car returned and approached them, Rodriguez and Lozano were "walking like right next to each other." Thus, the jury could have resolved any discrepancies in the testimony by crediting that which reflected an intent to kill Lozano, as well as Rodriguez. In sum, we conclude that the jury

could have reasonably found that, based on the circumstances of the shooting, Joshua intended to kill Lozano. Thus, Joshua's argument fails.

¶ 91                              D. Constitutional Arguments

¶ 92    We choose to combine our analysis of Joshua's remaining two arguments, as both concern the constitutionality of the statutory provisions that resulted in his trial in adult court and his ultimate sentence. First, Joshua argues that the "exclusive jurisdiction" provision of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2006)), which excludes 17-year-old minors from juvenile court, violates juveniles' constitutional rights by subjecting them to adult prosecution and sentencing without any consideration of their youthfulness and its attendant circumstances. See 705 ILCS 405/5-120 (West 2006). Specifically, he contends that this provision violates the eighth amendment to the United States Constitution (U.S. Const., amend. VIII) as well as both substantive and procedural due process.

¶ 93    Second, Joshua argues that, by virtue of being tried in adult court, he was subject to the combined application of provisions for mandatory firearm enhancements, mandatory consecutive sentencing, and "truth in sentencing," which was unconstitutional because it did not permit consideration of his youth at the time of the offenses. Joshua contends that the confluence of these provisions violates the eighth amendment and the proportionate-penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) (which are read co-extensively (see *In re Rodney H*., 223 Ill. 2d 510, 518 (2006))).

¶ 94    We review *de novo* arguments concerning the constitutionality of statutes. *People v. McCarty*, 223 Ill. 2d 109, 135 (2006). Further, we presume that all statutes are constitutional and, where possible, must construe a statute to uphold its constitutionality. *People v. Vasquez*, 2012 IL App (2d) 101132, ¶ 53.

¶ 95    Joshua argues that his constitutional arguments must be assessed in light of recent United States Supreme Court decisions, which, he argues, have significantly changed the law concerning the treatment and sentencing of minors.  Those cases, he asserts, make clear that there exist fundamental differences between juveniles and adults, such that juveniles may not be prosecuted and sentenced in the same manner as adults without consideration of youth and its attendant circumstances.  See *Miller v. Alabama*, __ U.S. __, 132 S. Ct. 2455 (2012); *J.D.B. v. North Carolina*, __ U.S. __, 131 S. Ct. 2394 (2011);[3] *Graham v. Florida*, 560 U.S. 48 (2010); *Roper v. Simmons*, 543 U.S. 551, 569-73 (2005).

¶ 96    Indeed, there is really no question from those cases that there exists a growing trend to acknowledge that juvenile offenders are inherently different from adult offenders and that, therefore, what might be constitutional as applied to an adult might not meet constitutional muster when applied to a juvenile.  See, *e.g.*, *People v. Willis*, 2013 IL App (1st) 110233, ¶ 47.  Specifically, in *Roper*, the Court held that capital punishment for juvenile offenders violates the eighth amendment.  *Roper*, 543 U.S. at 568.  In *Graham*, the Court held that, when imposed on a juvenile offender for a crime other than homicide, a life sentence without the possibility of parole violates the eighth amendment.  *Graham*, 560 U.S. at 74.  The *Graham* Court nevertheless noted that "[t]he Eighth Amendment does not foreclose the possibility that persons convicted of nonhomicide crimes committed before adulthood will remain behind bars for life."  *Id.* at 75.  Most recently, in *Miller*, the Court held that, even for those convicted of homicide, the eighth amendment prohibits "a sentencing scheme that mandates life in prison without possibility of

---

[3] We choose not to discuss *J.D.B.*, as it concerned custodial interrogation of minors and therefore implicates the fifth amendment and not, as relevant here, the eighth amendment. *J.D.B.*, ___ U.S. at ___, 131 S. Ct. at 2406.

parole for juvenile offenders." *Miller*, ___ U.S. at ___, 132 S. Ct. at 2469. The Court noted that, under the sentencing scheme at issue, the sentencing court was prevented from considering that the juvenile was not as culpable and had a "greater capacity for change" than an adult in similar circumstances. (Internal quotation marks omitted.) *Id.* at ___, 132 S. Ct. at 2460. The Court continued that "[b]y making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment." *Id.* at ___, 132 S. Ct. at 2469. *Roper*, *Graham*, and *Miller* all considered that, as compared with adults, juveniles lack maturity, have an underdeveloped sense of responsibility, and are more easily influenced by peer pressure, and, because the character of a juvenile is not yet fully formed, his or her personality traits remain susceptible to change. *Roper*, 543 U.S. at 569-70; *Graham*, 560 U.S. at 68; *Miller*, ___ U.S. at ___, 132 S. Ct. at 2464-65.

¶ 97 Nevertheless, we reject Joshua's constitutional arguments. Simply put, despite the foregoing Supreme Court decisions, courts in this state have consistently rejected the arguments he raises here. We will not repeat the same analyses that have, essentially, been set forth at length multiple times. Suffice it to say, however, that section 5-120 of the Juvenile Court Act has consistently been upheld as constitutional, generally on the basis that, unlike the statutes at issue in *Roper*, *Graham*, and *Miller*, it is not itself a sentencing statute and, therefore, imposes no sentence.[4] Rather, section 5-120 determines only where a juvenile is to be tried. Thus, courts

---

[4] As noted, Joshua asserts that section 5-120 of the Juvenile Court Act is unconstitutional because it automatically excludes 17-year-olds from juvenile court. Similarly, however, section 5-130 of the Juvenile Court Act, the "excluded jurisdiction" provision, excludes from juvenile court jurisdiction minors 15 years old or older charged with certain offenses, including first-degree murder. 705 ILCS 405/5-130 (West 2006). Accordingly, courts have applied to both

have held that section 5-120 is not subject to and does not violate the eighth amendment or the proportionate-penalties clause. Further, courts have also consistently held that section 5-120 does not, by virtue of determining where juveniles will be tried, deprive juveniles of substantive or procedural due process. See, *e.g.*, *People v. Patterson*, 2014 IL 115102, ¶¶ 89-111 (section 5-130 of the Juvenile Court Act does not violate due process, the eighth amendment, or the proportionate-penalties clause); *People v. M.A.*, 124 Ill. 2d 135, 147 (1988) (section 5-130 does not violate due process); *People v. J.S.*, 103 Ill. 2d 395, 405 (1984) (same); *Harmon*, 2013 IL App (2d) 120439, ¶¶ 54-56, 59-62 (despite holdings in *Miller*, *Roper*, and *Graham*, neither section 5-120 nor section 5-130 violates eighth amendment or due process); *Willis*, 2013 IL App (1st) 110233, ¶ 53 (despite holdings in *Miller*, *Roper*, and *Graham*, section 5-130 does not violate eighth amendment, proportionate-penalties clause, or substantive or procedural due process); *People v. Pacheco*, 2013 IL App (4th) 110409, ¶¶ 55, 65 (same);[5] *People v. Jackson*,

sections the same analysis and, in doing so, have upheld their constitutionality. See, *e.g.*, *People v. Harmon*, 2013 IL App (2d) 120439, ¶¶ 55-56, 59, 62 (rejecting arguments regarding section 5-120 for reasons applicable to section 5-130). As such, and because the authority on this issue is interchangeable, we also cite cases considering section 5-130 here.

[5] On June 26, 2014, this court entered an order holding our disposition of this case in abeyance until our supreme court rendered a decision in *Pacheco*, 2013 IL App (4th) 110409, *appeal allowed*, No. 116402 (Sept. 25, 2013), or *People v. Jenkins*, 2013 IL App (1st) 103006-U, *appeal allowed*, No. 115979 (Sept. 25, 2013). On January 27, 2015, however, the supreme court found that those petitions for leave to appeal were improvidently granted and, therefore, it vacated those orders and denied the petitions. Accordingly, this disposition no longer needs to be held in abeyance.

2012 IL App (1st) 100398, ¶¶ 17, 19 (despite holdings in *Roper* and *Graham*, section 5-130 does not violate eighth amendment, proportionate-penalties clause, or substantive or procedural due process); *People v. Salas*, 2011 IL App (1st) 091880, ¶¶ 66, 76-80 (same).

¶ 98      Further, courts have also rejected the argument that the Juvenile Court Act's sentencing implications, whereby juveniles are subject to automatic application of adult sentences and "truth in sentencing" provisions, are unconstitutional.  See, *e.g.*, *Patterson*, 2014 IL 115102, ¶¶ 100-11; *Pacheco*, 2013 IL App (4th) 110409, ¶¶ 57-58, 60.  The court in *Pacheco* noted that, taken to its logical extension, the argument suggests that it is unconstitutional to subject a juvenile to the same mandatory minimum sentence as an adult, a result *not* warranted by the *Miller*, *Graham*, and *Roper* holdings, which concerned only the harshest possible penalties.  *Pacheco*, 2013 IL App (4th) 110409, ¶ 58.  Indeed, *Miller* states that "*Graham*, *Roper*, and our individualized sentencing decisions make clear that a judge or jury must have the opportunity to consider mitigating circumstances before imposing the *harshest possible penalty* for juveniles." (Emphasis added.)  *Miller*, ___ U.S. at ___, 132 S. Ct. at 2475.  Further, the *Miller* Court expressly declined to foreclose a life sentence without parole for a juvenile in a homicide case (although it suggested that the occasions whereby such sentences would be appropriate would be "uncommon").  *Id.* at ___, 132 S. Ct. at 2469.

¶ 99      Here, Joshua did not receive the "harshest possible penalty," *i.e.*, he did not receive a natural-life sentence without the possibility of parole.  Indeed, he received the minimum sentence possible for murder and possession of a stolen motor vehicle, and he received only four years more than the minimum for attempted murder.  Joshua argues that the 75 years imposed nevertheless constitutes a "*de facto*" life sentence.  However, courts have rejected such an argument, noting that there are distinct differences between a sentence of natural life without

parole and a sentence of a determinate, albeit lengthy, number of years. See, *e.g.*, *Patterson*, 2014 IL 115102, ¶¶ 107-11; *People v. Gay*, 2011 IL App (4th) 100009, ¶¶ 19-20, 22-25 (the defendant's aggregate 97-year sentence was not a *de facto* life sentence without parole).

¶ 100   Further, to the extent that the Supreme Court decisions can be read broadly as requiring that, before sentencing a juvenile, the sentencing body must have an opportunity to take into account the juvenile's youth at the time of the crime, that requirement was satisfied here. See *Harmon*, 2013 IL App (2d) 120439, ¶¶ 54, 62. The court in this case expressly acknowledged Joshua's youth and considered all mitigating evidence before imposing the sentence. Again, after doing so, the court imposed the minimum term of imprisonment for murder, only four years above the minimum for attempted murder, and the minimum for possession of a stolen motor vehicle. Moreover, while the aggregate number of years is indeed significant, it must be remembered that Joshua was convicted of murdering one 15-year-old and attempting to murder a second one.

¶ 101   The fact that consistent with our sister courts we reject Joshua's arguments regarding the sentencing scheme at issue is not to say that we take his arguments lightly. The Supreme Court has, indeed, made very clear that, for constitutional purposes, some consideration must be made of the fact that juveniles and adults are inherently different. The courts in *Patterson*, *Willis*, and *Pacheco* note that whether the current sentencing scheme in Illinois, which requires certain juveniles to be tried and sentenced as adults, continues to be sound policy in this State is for the General Assembly, not courts, to decide, and they suggest that a renewed discussion on the subject might be warranted. *Patterson*, 2014 IL 115102, ¶ 111; *Willis*, 2013 IL App (1st) 110233, ¶¶ 54-58; *Pacheco*, 2013 IL App (4th) 110409, ¶¶ 67-68. We do not disagree, and we join that call.

¶ 102 In that vein, we note that we find particularly troubling the current limitations placed upon a sentencing court's discretion when mandatory sentencing enhancements are at play for a juvenile offender. Although the sentencing court is aware that it must apply the enhancements, the fact remains that, even if the court determines that, due to the attendant circumstances of youth, a minimum sentence for a juvenile is warranted, it cannot deviate from the mandatory add-ons that might be greater punishment than it found appropriate for the underlying crime. For example, here, the court determined that 20 years' imprisonment was appropriate for Joshua's decision to take another's life. However, it was required to impose another *25 years* to that sentence because Joshua did so with a firearm. 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2006). Similarly, the court determined that 10 years' imprisonment should be imposed for Joshua's attempted murder of a young girl. However, it was required to impose another *20 years*, indeed *twice* the underlying sentence, because Joshua did so with a firearm. 730 ILCS 5/5-8-1(a)(1)(d)(ii) (West 2006). We do not suggest that the crimes at issue here or the use of a firearm during those crimes should be punished lightly, or that the instant sentence is inappropriate, but where there exists an evolving trend that the attendant circumstances of youth must be considered at sentencing, the court's restricted discretion and required imposition of an add-on that is more than what the court determines is reasonable for the underlying offense should, in our opinion, be revisited.

¶ 103                                    III. CONCLUSION

¶ 104 For the forgoing reasons, we affirm the judgment of the circuit court of Kane County.

¶ 105 Affirmed.