# Illinois Official Reports

## Appellate Court

---

### *People v. Horta*, 2016 IL App (2d) 140714

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSE J. HORTA, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-14-0714 |
| Filed | December 5, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 12-CF-1763; the Hon. Mark L. Levitt, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Thomas A. Lilien, Patricia Mysza, and Jennifer Bontrager, of State Appellate Defender's Office, of Elgin, for appellant.<br><br>Michael G. Nerheim, State's Attorney, of Waukegan (Lawrence M. Bauer and Aline Dias, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE ZENOFF delivered the judgment of the court, with opinion.<br>Justices Burke and Hudson concurred in the judgment and opinion. |

**OPINION**

¶ 1    After a jury trial, defendant, Jose J. Horta, was convicted, under an accountability theory, of first-degree murder (720 ILCS 5/9-1(a)(2) (West 2010)). The trial court sentenced him to 59 years' imprisonment, which included a mandatory 15-year add-on because defendant was armed with a firearm during the commission of the offense (see 730 ILCS 5/5-8-1(a)(1)(d)(i) (West 2010)). Defendant appeals, contending that (1) his sentence is excessive given (a) the various mitigating factors and (b) that the three other people who were convicted of the murder all received shorter sentences; and (2) the mandatory 15-year add-on, as applied, violates the eighth amendment (U.S. Const., amend. VIII) and the Illinois Constitution's proportionate-penalties clause (Ill. Const. 1970, art. I, § 11). We affirm.

¶ 2    At trial, Richard Del Boccio testified that, on the morning of July 6, 2011, while he was at the Penny Road Pond forest preserve, he saw the body of a man, later identified as David Campbell, partly submerged in the water. Del Boccio called the police. Detective Sajid Haidari of the Cook County sheriff's police testified that he participated in responding to the call. Near the shoreline was Campbell's nude body, with lacerations to the top of the forehead and behind the left ear; abrasions to the face; several marks on the thighs and genitals; more marks on the chest; and a mark on the right wrist. Lying a few feet away was a plastic zip tie. The body was removed from the water, and photographs were taken. At trial, Haidari testified that they showed marks on Campbell's left wrist and right hand; abrasions to his back in the left-shoulder area; and marks that went all the way around his neck. On July 7, 2011, Haidari attended as Dr. Ariel Goldschmidt performed Campbell's autopsy. At trial, Haidari identified photographs from the autopsy and testified that they showed Campbell's body, in substantially the same condition as it had been at the pond. At some point, Haidari and another retrieved Campbell's car in Indiana. In June 2012, the sheriff's police turned the investigation over to the Waukegan police.

¶ 3    Goldschmidt testified as follows. On July 7, 2011, he performed the autopsy on Campbell. He observed petechial hemorrhages in the right eye, *i.e.*, the rupturing of small blood vessels on the surface of the eye, and burst capillaries. Both types of injuries had been caused by oxygen loss. Multiple abrasions ran the circumference of Campbell's neck. One possible cause of such injuries is a ligature, such as a rope or a zip tie, applied with pressure around the neck.

¶ 4    The court admitted photographs of Campbell's injuries. Goldschmidt testified that they showed the abrasions to the neck; an abrasion just medial to the left shoulder; and vomit underneath the nose. Goldschmidt testified further that, during the autopsy, he observed a laceration to Campbell's left earlobe and several incised wounds and abrasions around the right ear, caused by a sharp object of some type. Inside Campbell's neck there was bleeding to the soft tissue in several areas, an expected result of blunt force or pressure to the outside of the neck. Campbell's brain was swollen, meaning that death had been "slow, slower than immediate," as "there was time for the lack of oxygen to damage the brain and cause it to swell."

¶ 5    Goldschmidt opined to a reasonable degree of medical certainty that Campbell's death was caused by strangulation. He based his opinion on the findings indicating pressure around the neck and oxygen deprivation. Goldschmidt stated that a person would die within minutes from strangulation but would probably lose consciousness within seconds. The findings were also consistent with asphyxiation, a general term for oxygen deprivation. Either strangulation or

asphyxiation would produce the petechial hemorrhaging and brain swelling, but asphyxiation would take somewhat longer to cause death; the victim would pass out "[w]ithin minutes." Asphyxiation could be caused by placing a plastic bag over the person's head. Goldschmidt could not determine how long it took for Campbell to die.

¶ 6        Goldschmidt testified that an X-ray did not show the cause of Campbell's death but ruled out shooting. The laceration to the top of the head did not cause death, either, although the force that produced it also caused bleeding within the scalp. There were scrapes and bruises to Campbell's external chest; an abrasion to his right wrist, left hand, and left wrist; and injuries to the left wrist, consistent with pressure being applied by an object wrapped around it. Goldschmidt observed a pattern of recent thermal injuries to Campbell's legs and the tip of his penis; these injuries were consistent with the use of a blowtorch or lighter. Goldschmidt could not determine whether these injuries were inflicted before or after Campbell was dead.

¶ 7        Jason Gutke, a Waukegan police detective, testified as follows. On July 2, 2011, while investigating a report of a kidnapping, he interviewed defendant, who told Gutke the following. He resided at 1034 North Butrick in Waukegan, as did Roberto Guzman, Michael Castellanos, and Nadia Palacios. At about 8:30 that morning, while he was away from home, he received a call from Castellanos. Castellanos said that he, Guzman, and Palacios had been kidnapped and driven to an abandoned house in North Chicago, where they were held down at gunpoint and Palacios was penetrated with a butter knife. He and Palacios had gotten free and were on Jackson, but the kidnappers still had Guzman. Defendant tried calling Guzman but could not reach him. He told Castellanos and Palacios that he would try to get a ride to meet them. Defendant got a ride. He saw Castellanos and Palacios near Jackson. She was shoeless. Both had red marks on their wrists from being tied up. Gutke asked defendant who would do such a thing to his three housemates; defendant said that he had no information on that.

¶ 8        Defendant also wrote a statement that was consistent with Gutke's account of the interview. It added that Castellanos told defendant that the kidnappers, black men, broke into Guzman's van and abducted the three victims at gunpoint. Also, Palacios told defendant that she knew where the abandoned house was, as the kidnappers had disclosed it while driving her there.

¶ 9        Alejos Villalobos, a Waukegan police detective, testified as follows. On June 20, 2012, at the police station, he and Detective Ulloa interviewed defendant. At that time, the only other suspect in the Campbell case who had made a statement to the police was Palacios. Villalobos asked defendant whether he knew why he was there; defendant said that it was because of "the thing with Nadia, Robert [*sic*] and Big Stank [Eric Castillo]." He described Castellanos' account of the kidnapping and his subsequent contact with Castellanos and Palacios. Defendant also said that his friends reported that they had been robbed; that some black males came to the abandoned house and took Palacios; and that one of them put a knife into her vagina.

¶ 10        Villalobos testified that defendant continued as follows. At some point after his friends had all been freed, Guzman called him and said that he thought he knew who one of the robbers was. Defendant asked Guzman what he would do about it, and Guzman said that "he was going to rob him or do whatever" and asked defendant whether he wanted to be part of it. Defendant said at first that he did not know, "and then they [*sic*] asked him this is for Nadia, at which time he said that he would take part in it." Villalobos' testimony continued:

"Q. Did he indicate to you anything else about what happened after Robert called him and told him we think we got the guy that did the robbery?

A. Yes. He stated that Robert gave him a .22 and that he pointed the gun at the guy and told the guy to get on his knees.

Q. Did he indicate to you what the guy said when he told him to get on his knees?

A. He said the guy said all right. The guy then got on his knees. [Defendant] then went on to explain that Big Stank and a Mexican guy then grabbed the guy and started beating on him while [defendant] was holding the gun towards him. He actually showed a motion where he put his hands up as if he is holding a gun like he is pointing it at the guy (indicating).

Q. For the record, [Villalobos] just put [his] hands out kind of in the form of a gun and [his] arms were parallel to the ground. Is that the motion he was making?

A. That's correct.

Q. What else did he say?

A. He goes on to describe how while they were beating him what they did to him as far as they put bags over his head. Specifically we asked him how many bags. He said five or six bags. We asked him what the guy was saying. He said the guy was saying that he didn't know what they were talking about and that he didn't have anything to do with the kidnapping."

¶ 11　　Villalobos testified that defendant said that the foregoing happened at an auto body shop. Asked who had been there at the time, defendant named himself, Palacios, "Big Stank [Castillo], the kid [Alex Rivera] and the Mexican guy." Defendant said that Guzman had not been there but had called him at one point to find out "what was going on and how things were going." Defendant added that, while he had the gun pointed at Campbell, he told him, "so you like to put knives in girls' pussies. How about I put a bullet in your head?" Campbell responded that he did not know what defendant was talking about. During this time, Palacios was laughing at Campbell and accusing him of the sexual assault, "based on the shoes that he was wearing."

¶ 12　　Villalobos testified further that defendant related that, when Campbell entered the room, Castillo grabbed him and held him while the "Mexican guy" punched him. Asked about other injuries that were inflicted on Campbell, defendant disclosed the following. At some point after accusing Campbell, Palacios left the room, returned with a blowtorch, and "torched his ass and his dick." Campbell's hands were zip-tied together; his feet were taped; and the "Mexican guy" hit him over the head with a hammer as Castillo was holding onto him. The attackers put five or six plastic bags over Campbell's head. The detectives asked whether Campbell was breathing when the bags were put over his head, and defendant indicated that, at that point, "he could see the bag going in and out." Defendant told the detectives that, as the attack went on, "he was standing there with the gun and was thinking to himself what the fuck am I doing?"

¶ 13　　Villalobos testified that the detectives asked defendant where he had obtained the gun. He said that Palacios drove him to the shop, arriving about 15 minutes before Campbell appeared. Guzman was there. He gave defendant the gun, told him to point it at Campbell to scare him, and left before Campbell arrived. Defendant added that Campbell went to the shop because he

had been led to believe that Guzman would sell him drugs there; actually, Guzman had no drugs and was setting Campbell up for the attack.

¶ 14    Villalobos testified that the detectives asked defendant about his role in moving the body. At first, defendant said that he rode out of the shop with the "Mexican guy" and the body, but that the "Mexican guy" dropped him off early, disposed of the body, and came back an hour later and drove him to a hotel in Kenosha. After the detectives confronted him with a tollbooth video, he said that he and the "Mexican guy" left the shop together in the latter's car, with defendant driving; that they stopped near a pond and unloaded Campbell's body; that the "Mexican guy" dragged the body away and told defendant to come back in 20 minutes; and that, when defendant came back, he picked up the "Mexican guy" on the road. Defendant added that, on the ride back from the pond, "he was thinking he couldn't believe what he had just done."

¶ 15    Villalobos testified that defendant recounted that, at the Kenosha hotel, Guzman passed out $18,000 that had been taken from Campbell. Defendant received $1000. After the interview ended, defendant viewed photographic lineups and identified Castillo, Palacios, Guzman, and Rivera (who had accompanied Campbell to the shop). A DVD of the interview was published to the jury.

¶ 16    Castellanos then testified as follows. On July 2, 2011, he lived at 1034 North Butrick with Guzman, Palacios, and defendant. That evening, he was at home with Guzman and Palacios. A storm knocked out the power, so they sat in Guzman's vehicle outside to watch a movie. A man opened the door, put a gun to Guzman's head, and pulled him out. Three other men pulled out Castellanos and Palacios. The attackers put zip ties on their victims' hands and bags over the victims' heads, took them inside the house, and got Castellanos' keys from him. One attacker drove Castellanos' vehicle to a house in North Chicago. They were there for 20 or 30 minutes. The attacker then let Castellanos and Palacios leave. Castellanos and Palacios removed the bags and zip ties, and Castellanos called defendant, who eventually picked them up. They told him what had just happened.

¶ 17    Castellanos testified further that, on July 6, 2011, just after midnight, he was having a get-together on his porch when defendant arrived and approached him. He told Castellanos to smell his hands and added, " 'You want to know what a dead body smells like?' " Castellanos smelled bleach on defendant's hands and told him to go inside and shower. Defendant showered, returned, and told Castellanos about the attack on Campbell. Specifically, he related that "[h]e held a gun, that he put the tape around David Campbell's neck and that he hit [Campbell] with a gun." Defendant said that he put tape around Campbell's neck "[w]ith a bag, like a bag around his neck, then taped it around." He added that, after Campbell died, he put bleach on the body. He said that he was compensated $1000 for his role in the killing.

¶ 18    Alex Rivera testified as follows. Campbell had been his friend. At the time of the attack, he had also known Guzman and defendant for two or three years and was acquainted with Castillo and Castellanos. On July 5, 2011, Campbell called Rivera and picked him up "[f]or a drug deal," of which Campbell had recently told him. They parked in front of Campbell's girlfriend's house. Guzman called and asked Rivera to bring Campbell to the auto body shop so that Guzman could sell him drugs. Campbell, accompanied by Rivera, then drove there.

¶ 19    Rivera testified that, when he and Campbell arrived at the shop, Palacios greeted them and escorted them inside. Palacios said that the deal would take place in the office, so they all went there. Rivera entered the office; a man standing behind a desk shook his hand, bear-hugged

him, emptied his pockets, and set him on a couch in the corner. Campbell then entered. Castillo came from behind the door, bear-hugged Campbell, put him down onto the floor, and held him down. Castillo asked Campbell who had sent him; Campbell responded that nobody had.

¶ 20 Rivera testified that next Palacios and defendant entered the office together. Defendant was holding a black object by his side. Castillo then hit Campbell with a hammer in the head and chest. Next, he placed a grocery bag over Campbell's head. During this time, defendant said nothing to Campbell. Palacios repeatedly told Campbell " 'I know it was you,' " but Campbell denied the accusation. Shortly afterward, Palacios entered with a blowtorch, pulled down Campbell's pants, and "blow torched his penis." The man who had bear-hugged Rivera put more bags over Campbell's head and zip-tied them around his neck.

¶ 21 Rivera testified that Palacios told him to go with her. They entered Campbell's vehicle and Palacios drove away. Stopping in Indiana, she pulled out a bottle of bleach, wet down some surfaces, and told Rivera to help her wipe them down, which he did. Later, Guzman, who had not been at the shop, and Castillo picked them up and drove to a hotel in Kenosha. Defendant showed up a little later. Guzman took a stack of money and distributed some to Castillo, Palacios, and defendant. Rivera stayed overnight and was dropped off at home the next morning.

¶ 22 Rivera testified that he never saw defendant point the black object in his hand. Defendant did not go toward Campbell while the latter was lying on the floor and did not say anything while Rivera was there. Defendant did not assist in either putting the plastic bags over Campbell's head or using the blowtorch on him.

¶ 23 The jury found defendant guilty of first-degree murder under an accountability theory. The jury also found that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty (see 730 ILCS 5/5-5-3.2(b)(2) (West 2010)) and that defendant had been armed with a firearm during the commission of the offense.

¶ 24 Defendant moved for a new trial and also filed a document entitled "Disparity of Sentence," which stated as follows. In addition to facing the standard sentencing range of 20 to 60 years' imprisonment for first-degree murder (see 730 ILCS 5/5-4.5-20(a) (West 2010)), defendant (1) was eligible for life imprisonment, based on the jury's finding of exceptionally brutal or heinous conduct (see 730 ILCS 5/5-8-1(a)(1)(b) (West 2010)); and (2) was subject to the mandatory 15-year firearm add-on (see 730 ILCS 5/5-8-1(a)(1)(d)(i) (West 2010)). Defendant was 21 years old with no juvenile record and one adult Class 4 felony for which he had received probation. The trial established that he was not a principal but an accomplice to the murder; he did not plan it, contact the other participants, or participate in the strangulation that killed Campbell. His role was only to hold a gun. Guzman had already been sentenced for first-degree murder to 29 years' imprisonment. He had a serious criminal history and, before Campbell's murder, had been involved in a large drug distribution scheme. The document argued that similarly situated defendants must not be given grossly disparate sentences but it did not request any specific relief.

¶ 25 The presentence investigation report (PSIR), filed January 30, 2014, disclosed the following information. Defendant was born November 5, 1992. On May 7, 2013, Guzman pleaded guilty to first-degree murder and was sentenced to 29 years in prison. Castillo and Palacios had been charged with first-degree murder but not yet tried. On October 1, 2012, Rivera pleaded guilty to obstructing justice, a Class 4 felony. He had not yet been sentenced.

¶ 26    The PSIR reported that, shortly after being taken into custody in June 2012, defendant got into an altercation with other jail inmates and served 15 days in the administrative corrections unit; he had had no other problems in jail. He had no juvenile record. Aside from two fines for possession of cannabis, one for a curfew violation, and a bond forfeiture for traffic offenses, his adult record included a 2011 conviction, based on a guilty plea, of attempting to defeat a drug urine screen, a Class 4 felony for which he received 24 months' probation. In February 2012, defendant was arrested for illegal transportation of alcohol and consumption of liquor by a minor. He tested positive for cannabis and failed to complete a substance-abuse evaluation. A petition to revoke his probation in the drug-screen case was filed but withdrawn later. On April 4, 2012, he pleaded guilty to the liquor charge, and the transportation-of-alcohol charge was nol-prossed. He served four days in jail. On June 20, 2012, he was arrested for Campbell's murder.

¶ 27    The PSIR stated that, after his arrest, defendant was taken for immigration detention in February 2012 and released on his own recognizance in March 2012. He was "currently under removal proceedings." He had earned his G.E.D. while in jail in the present case. Defendant reported having used alcohol regularly since age 17, cannabis regularly since age 14, and cocaine once only at age 18.

¶ 28    On April 3, 2014, the trial court held a sentencing hearing. Charles Schletz, a Waukegan police investigator, testified as follows. On June 20, 2012, he participated in interviewing Castillo about Campbell's murder. Castillo described defendant's involvement but said nothing about a handgun. However, Schletz and the other officers never asked him whether defendant had had a firearm. Castillo added that defendant went through Campbell's pockets and took out the money, a detail that Schletz had not heard before.

¶ 29    In argument, the prosecutor stated as follows. The murder of Campbell was an act of vigilantism, with no evidence that he had been involved in the kidnapping. When Guzman called defendant and asked him to participate in the murder, defendant, "without hesitation," agreed. Defendant told the police that he not only pointed a gun at Campbell but ordered Campbell to get on his knees and asked him whether he would like defendant to put a bullet into his head. Moreover, by holding the gun on Campbell, defendant negated any chance that Campbell had to escape.

¶ 30    The prosecutor argued that the jury rightly found that the murder was accompanied by exceptionally brutal or heinous conduct, amounting to prolonged torture—which defendant enabled by holding the gun on Campbell. Defendant was the only person there with a gun; he could have walked away, poked a hole in the bag over Campbell's head, or turned the gun on the others to get them to stop. He did none of those things. Moreover, he helped to dispose of the body and accepted $1000 from the victim's pockets as compensation for his role in the murder.

¶ 31    The prosecutor noted that, with the automatic enhancement for the use of a firearm, defendant's minimum sentence was 35 years' imprisonment. But because the murder was accompanied by exceptionally brutal or heinous conduct, he was eligible for life. Aside from these considerations, several aggravating factors applied. Defendant was compensated for the crime (see 730 ILCS 5/5-5-3.2(a)(2) (West 2010)); he had a criminal history, having been sentenced to probation for a Class 4 felony and then having violated his probation and misbehaved in jail (see 730 ILCS 5/5-5-3.2(a)(3) (West 2010)); and a substantial sentence was necessary to deter others from crimes such as defendant's, in which he and the others took the

law into their own hands and murdered another person on a hunch (see 730 ILCS 5/5-5-3.2(a)(7) (West 2010)). On the other hand, none of the statutory factors in mitigation (see 730 ILCS 5/5-5-3.1(a) (West 2010)) applied. The only one arguably pertinent was that defendant's crime was induced or facilitated by someone else (730 ILCS 5/5-5-3.1(a)(5) (West 2010)); defendant was not the mastermind of the murder, as Guzman had set it in motion. But defendant could easily have declined to become involved. Instead, he willingly joined.

¶ 32    The prosecutor then turned to defendant's sentencing-disparity argument. The cases of Rivera and Guzman were not appropriate for comparison, because they were based on different evidence. Both had pleaded guilty, accepting responsibility for their acts and assisting the State in doing so. Guzman had made no admissions, and a jury trial would have required the State to rely on evidence from codefendants who had been given deals to testify against him. Rivera had had no idea that Campbell was being set up for a murder, and he was not convicted of that offense. The prosecutor urged a sentence "in the high 50s, the low 60s, based on the brutal and heinous nature of [the crime]" and the vigilantism against a person who the perpetrators had no basis to believe had committed the acts for which they allegedly sought revenge.

¶ 33    Defendant argued as follows. He was 21 years old. He had no juvenile history and only one adult felony conviction, of violating a drug screen. As to the murder itself, he was convicted as an accomplice, not a principal. He acceded to Guzman's request after initially declining. Moreover, "his role in this murder case was to hold the gun, but the gun was never discharged or *** used." Guzman, who had a history of criminality, set everything in motion, contacting defendant and the others and paying them afterward. His sentence was 29 years, and defendant's ought not be disproportionate to his or to those of the others who were responsible.

¶ 34    Defendant argued further that he had cooperated with the police; had a strong family to support him; and participated only to help Palacios and not to settle any vendetta or "do anything brutal and heinous." He continued:

> "We can't argue about the enhancement. That would be 15 years. We can't argue about the brutal and heinous. That's 25 years. We're just asking you to sentence him to 45 years, which would probably be the most appropriate.
>
> * * *
>
> I think, in terms of sentencing, a 45-year sentence would be similar to what [Guzman] was sentenced to. Forty-five years, that would be 25 for the brutal and heinous, concurrent with the 15 years on the gun charge [*sic*]. And based on that, Judge, I think that, within that range, the Court would sentence him appropriately."

Defendant allocuted briefly, saying that he was "sorry for what happened to Mr. Campbell." He expressed the wish that "this Court and this whole system *** treat [defendant] fairly." He added, "the guy that actually committed this crime is not here. And I just hope, you know, the system, you know, gets right some day."

¶ 35    The judge stated as follows. He had considered all of the factors in mitigation and aggravation and the facts as they had been brought out at trial. As a result of defendant's actions, the Campbell family would have to live knowing that "[Campbell's] last moments on this earth were spent in constant pain as he was tortured." The judge had considered defendant's actions both before and after Campbell's death, including his role in attempting to conceal the crime. Defendant did have a relatively limited criminal history. The judge imposed

a sentence of 44 years' imprisonment plus the mandatory 15-year firearm add-on, for a total of 59 years.

¶ 36 Defendant moved to reconsider the sentence, reiterating his arguments from the sentencing hearing. At the hearing on his motion, he also noted that Palacios was still awaiting sentencing and that Castillo had been tried, convicted, and sentenced to 35 years' imprisonment. The prosecutor noted that the jury in that case did not find that Castillo had been armed with a firearm at the time of the offense, accounting for some of the disparity. Also, Guzman had not been at the scene of the murder during its commission, so the State would have risked much at a jury trial in which it would have had to rely heavily on evidence from "wire taps and jailhouse informants and other individuals." He continued, "And our risk of trial was much greater with Mr. Guzman. And we believed that a plea to 29 was something that was in the interest of justice." Defendant countered that Guzman had set up the murder and that defendant had been there solely to protect Palacios and had not wanted to be involved in a murder.

¶ 37 The judge denied the motion to reconsider the sentence. Defendant timely appealed.

¶ 38 On appeal, defendant contends that, for two separate but interrelated reasons, his sentence is excessive and must be reduced. First, he argues, his 59-year sentence was an abuse of discretion, given (a) the various factors in mitigation and (b) the disparity between his sentence and those given to Guzman, Castillo, and Palacios. Second, he argues, the mandatory 15-year add-on is unconstitutional as applied to his case.

¶ 39 We turn to defendant's first argument, that the trial court abused its discretion in sentencing him to a total of 59 years' imprisonment, which he contends is a *de facto* life sentence, given that he can receive no good-conduct credit (see 730 ILCS 5/3-6-3(a)(2)(i) (West 2010)). Defendant acknowledges that the court was required to impose a sentence of at least 35 years, the basic 20-year minimum plus the mandatory 15-year firearm add-on. He also concedes that, because the jury found that the murder was accompanied by exceptionally brutal or heinous conduct indicative of wanton cruelty (730 ILCS 5/5-5-3.2(b)(2) (West 2010)), the court could have sentenced him to life imprisonment (see 730 ILCS 5/5-8-1(a)(1)(b) (West 2010)). Nonetheless, defendant asserts, his sentence is excessive, for two reasons. First, the court did not give sufficient weight to several important considerations: (1) when defendant committed his offense, he was only 18 years old; (2) although he was legally accountable for the actions of those who strangled Campbell to death, his role in the murder was "minimal"; (3) he expressed remorse for his crime; (4) his prior criminal record was slight; and (5) he showed evidence of rehabilitative potential. Second, defendant argues, Guzman, Castillo, and Palacios all received substantially shorter sentences than did he, even though they were equally or more culpable in the murder—thus making his sentence unfairly longer than theirs. Defendant requests that we reduce his sentence to the effective minimum, 35 years, or remand the cause for resentencing.[1]

_____

[1]We note that, at the sentencing hearing, defendant requested 45 years' imprisonment, 10 years more than he now requests. In the portion of the hearing quoted earlier, defendant's counsel apparently assumed that the court would enhance the basic sentence with both the mandatory firearm add-on (15 years) and an add-on based on the jury's finding of exceptionally brutal or heinous conduct. Counsel's request was based on the theory that, in addition to the minimum of 20 years, the court would be required to impose the 15-year firearm add-on and another add-on for exceptionally brutal or heinous conduct; that it could make the latter 25 years; and that it could also make the two add-ons "concurrent." (Whether this theory was legally sound is another matter, but defendant does not claim that his counsel was ineffective.) Thus, it is clear that defendant requested a sentence of 45 years, albeit

¶ 40   We turn to the first prong of the argument: that defendant's sentence, even when considered without regard to those of his codefendants, was excessive. The trial court has broad discretion in sentencing, and we may not disturb its decision merely because we might weigh the pertinent factors differently. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). We shall not reduce a sentence that is within statutory limits unless it is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense. *Id.* at 210.

¶ 41   Defendant concedes that his sentence is within the statutory limits; indeed, it could easily have been much longer. The trial court could have imposed life imprisonment, based on the jury's finding of exceptionally brutal or heinous conduct. Even after declining this option, the court could have imposed a total of 75 years' imprisonment—the maximum of the base range plus the mandatory 15-year add-on. Instead, defendant received a total of 59 years' imprisonment—24 years more than the effective minimum, but only 14 years more than what he himself requested.

¶ 42   We cannot say that the trial court's weighing of the various factors in aggravation and mitigation exceeded its broad discretion or that defendant's sentence, although unquestionably severe, departed from the spirit and purpose of the law or was manifestly disproportionate to the offense. We note the following.

¶ 43   First, there were several factors in aggravation that the trial court properly considered. For one, although the court did not use the jury's finding of exceptionally brutal or heinous conduct to sentence defendant to life, it quite reasonably considered the premeditation and extreme brutality of Campbell's torture-murder, as well as its utter gratuitousness. Defendant attached himself to a group that planned this execution with only the flimsiest grounds to suspect Campbell of any basis for their revenge. Campbell died not immediately but slowly (how slowly is uncertain) from strangulation or asphyxiation. And, before he died, he suffered severe external and internal wounds from blows to his head, neck, and chest, and from the application of the blowtorch to his genitalia and legs. The seriousness of the offense has been called the most important consideration in sentencing. *People v. Flores*, 404 Ill. App. 3d 155, 159 (2010). The crime here was premeditated, gratuitous, and sadistic to a degree that must be considered extraordinary even for a first-degree murder.

¶ 44   The extreme heinousness of the offense was not the only aggravating factor on which the trial court properly relied. The court also considered that defendant was compensated for the offense, receiving $1000 for one evening's work. The court also found that a substantial sentence was necessary to deter others. Although this factor probably applies in some degree to most sentencing decisions, the court noted that, in this instance, deterrence was especially important given the reckless vigilantism of defendant and his group. Finally, the court took into account that, after the murder was complete, defendant actively helped to conceal the body (and, we note, he initially lied to the police about this aspect of his conduct).

¶ 45   Defendant actually has little to say about the trial court's use of these important and accepted factors in aggravation. Instead, he concentrates on allegedly mitigating factors that,

---

perhaps under the misimpression that he was eligible for no less. It could be argued (although the State does not) that defendant has forfeited his request that we reduce his sentence to 35 years—10 years less than he conceded in the trial court would be proper. Nonetheless, we choose to disregard any forfeiture, based on our overriding concern with reaching a just result in a criminal case involving a lengthy sentence and also on the State's failure to raise any claim of forfeiture.

he claims, the court slighted. We do not find defendant's treatment of these factors persuasive; but even if we did, we would not substitute our evaluation of them for that of the trial court. See *People v. Fern*, 189 Ill. 2d 48, 53-54 (1999).

¶ 46    First, defendant contends that his participation in the murder was "minimal." He notes that he did not plan the crime, personally injure Campbell, or directly contribute to Campbell's death. It is true, as the prosecutor and the trial court acknowledged, that defendant did not instigate or mastermind the murder and did not inflict the fatal injuries. Nonetheless, no more than the trial court can we accept his characterization of his role as "minimal." By focusing on what he did not do, defendant slights the serious things that he *did* do. Defendant did not discharge the gun while Campbell was being murdered, but by pointing the gun at Campbell and ordering him to get on his knees, then holding the gun toward Campbell while two other men beat him, he greatly facilitated the acts of others that actually caused Campbell's death. Moreover, according to Castellanos, defendant admitted that he had taped Campbell's neck in order to secure one of the plastic bags and that he had hit Campbell with his gun. And as the prosecutor noted at the sentencing hearing, defendant not only performed acts that were important to carrying out the murder but also declined to do anything to lessen his role or interfere with the other murderers' acts.

¶ 47    Second, defendant contends, he showed remorse for his acts, "repeatedly apologizing" to Campbell's family. Defendant's sole record citation for his claim that he "repeatedly apologiz[ed]" is his allocution, which we quoted earlier. Although he did twice say, "I'm sorry," he also stated that "the guy that actually committed this crime is not here" and that "the system" was not treating him fairly. Defendant's words showed less remorse than denial. At the least, the trial court could reasonably have interpreted them that way.

¶ 48    Moreover, defendant's conduct in the hours directly after the murder hardly indicated a penitent spirit. Aside from helping to conceal the body, he took money from the victim's pockets (according to Castillo) and later received some of it as payment for his crime. He then boasted of his acts to Castellanos, inviting him to learn "what a dead body smells like." The trial court could reasonably find that defendant's terse expression of sorrow right before his sentence was pronounced counted for less than his repeated demonstrations of callousness and even pride when he was not speaking to the person who would decide his punishment.

¶ 49    Defendant relies most of all on his youth and relatively slight record at the time of the murder as mitigating factors to which the trial court gave insufficient weight. We agree that defendant's criminal record was not especially long or serious, but we note that the trial court explicitly took this into consideration. (The court could also have considered, however, that, at the time of the murder, defendant had accumulated one felony conviction and one misdemeanor conviction in the very short time since he turned 18.) The court also took defendant's relative youth into account. While we grant the general proposition that 18-year-olds have less impulse control or moral judgment than do most adults (a point to which we shall return in discussing defendant's constitutional claim), we note that defendant's criminal acts were not spontaneous or impulsive; he decided on his course of action well in advance and had had considerable time to abandon his role in the enterprise. We cannot say that defendant's youth and relatively limited record compelled the court to impose a lesser sentence.

¶ 50    Defendant might be correct that his 59-year prison term is tantamount to a life sentence. However, the legislature has decided as a matter of public policy that an *actual* life sentence

- 11 -

(much less one that is tantamount to life) need not be ruled out for a first-degree murder, even one committed by an 18-year-old. Thus, we cannot say that, under all the circumstances, defendant's lengthy sentence was greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense (see *Stacey*, 193 Ill. 2d at 210).

¶ 51 We turn to the second prong of defendant's first claim of error: that his sentence was impermissibly longer than those given three other defendants, all of whom, he maintains, were at least as culpable in this case and no more deserving of leniency for any other reasons. Defendant notes that Guzman, Castillo, and Palacios received sentences of (respectively) 29 years, 35 years, and 40 years. He contends that they participated more actively in Campbell's murder than did he, Castillo in particular being a principal and not merely an accomplice. Although we acknowledge that these three individuals could consider themselves fortunate to have received sentences substantially lighter than defendant's, we cannot say that the disparities require reducing his punishment.

¶ 52 Fundamental fairness forbids arbitrary and unreasonable disparities between the sentences of similarly situated codefendants. *People v. Caballero*, 179 Ill. 2d 205, 216 (1997). However, a disparity in sentences does not, by itself, establish fundamental unfairness. *Id.* A defendant who contends that his sentence is unfairly disparate to that of a codefendant has the burden to produce a record that is sufficient to support his claim. See *People v. Kline*, 92 Ill. 2d 490, 509 (1982); *People v. Gangestad*, 105 Ill. App. 3d 774, 785 (1982). Thus, if we have no record of the factors that the trial court relied on in sentencing the codefendant, we cannot decide whether any sentencing disparity was unfair, and we must therefore deny relief. See *Kline*, 92 Ill. 2d at 509; *People v. Cooper*, 239 Ill. App. 3d 336, 363 (1992).

¶ 53 Defendant's claim of an unfair disparity between his sentence and those of Guzman and Palacios suffers from a fatal weakness. Our supreme court has established the principle that a sentence imposed on a defendant who pleaded guilty per an agreement "does not provide a valid basis of comparison" to one imposed on another defendant after a trial. *People v. Moss*, 205 Ill. 2d 139, 171 (2001); see also *Caballero*, 179 Ill. 2d at 217. The court has explained that a trial court may grant dispositional concessions to a defendant when doing so serves the public's interest in the effective administration of justice. *Moss*, 205 Ill. 2d at 171; *Caballero*, 179 Ill. 2d at 218. We cannot state that our supreme court has laid down a *per se* rule that a defendant who is convicted after a trial can never succeed on a claim that his sentence is impermissibly longer than that of a codefendant who pleaded guilty. However, we agree with another court that, under *Caballero* and *Moss*, "[g]enerally, there is nothing wrong with the disparity between the sentences imposed on a defendant who pleads guilty and a defendant who does not." *People v. Jett*, 294 Ill. App. 3d 822, 831 (1998).

¶ 54 Although defendant received a longer sentence than did Guzman or Palacios, the *Caballero-Moss* principle defeats his claim. Even if these opinions do not bar every claim of an arbitrary disparity between a sentence imposed after a trial and one imposed after a guilty plea, it will be rare that such an argument could succeed. This case is not that rarity.

¶ 55 Before the trial court here, the prosecutor argued that Guzman's plea agreement spared the State the necessity of proceeding to a trial on relatively weak evidence and thus avoided the danger that Guzman would receive no punishment at all. Defendant did nothing to refute the conclusion that the concessions to Guzman advanced substantial public interests. Moreover, we have essentially no insight into the evidence and reasoning on which the court relied in sentencing Guzman. Thus, defendant has overcome neither the principle that a sentence

- 12 -

imposed on a guilty plea may not be compared with one imposed after a trial nor the rule that a defendant raising a claim of sentencing disparity must provide a sufficient record to support his claim. Defendant's claim that his and Guzman's sentences are unfairly disparate fails.

¶ 56  These same infirmities defeat defendant's argument that his sentence and Palacios' sentence are unfairly disparate. Like Guzman, Palacios pleaded guilty to first-degree murder.[2] Further, defendant relies on the record only in his case for any information about Palacios' role in the murder or any other matter that is relevant to her sentence. The record in this case does not establish that her role in the murder was greater than that of defendant. To be sure, it was great enough. Palacios was not only an accomplice, but she was directly responsible for one of its most brutal aspects—the blowtorching that, we may safely assume, caused Campbell excruciating pain. Moreover, it strongly appears that Palacios helped to encourage the initial decision to murder Campbell. Had she not been sure that he had been the one who had sexually assaulted her, the others might never have targeted him. Nonetheless, as noted, defendant also performed a substantial role before, during, and after the murder.

¶ 57  All of the foregoing is clear enough to us from the record in defendant's case. The trouble is that *nothing* is clear to us from the record in *Palacios'* case, because none of that record is before us, much less a sufficient portion from which to evaluate the fairness of the disparity between the sentences.[3] Thus, defendant's claim as to Palacios fails.

¶ 58  Finally, we turn to defendant's comparison of his sentence to Castillo's, which is not undermined by the *Caballero-Moss* principle, as Castillo was convicted after a trial. Nonetheless, defendant's argument lacks a sufficient basis in the record.

¶ 59  We note that Castillo was sentenced to 35 years' imprisonment, or 15 years more than the statutory minimum. As defendant himself requested a total sentence of 45 years' imprisonment, he might be on shaky ground in contending that the trial court violated fundamental fairness merely because his codefendant received a sentence 10 years less than what defendant requested. However, we acknowledge that defendant was actually sentenced to 59 years, so that, even had Castillo received 45 years, the disparity between the sentences would be substantial. Moreover, we need not resolve defendant's fundamental-fairness argument on the basis of forfeiture or waiver. The real difficulty that we see is that the record does not support defendant's claim on the merits.

¶ 60  Based on the evidence at trial, the trial court, in sentencing defendant, recognized that Castillo participated as a principal in the murder of Campbell, performing some of the acts that caused Campbell's death by strangulation. The evidence also was consistent that Castillo inflicted some of the serious wounds that were discussed by Goldschmidt and other witnesses and portrayed in the photographic evidence. For purposes of resolving defendant's unfair-disparity claim, we shall assume that the record in Castillo's trial established these facts as well and that the trial court there was aware of them. Nonetheless, having little if any other

[2]Defendant's appellate brief asserts that Palacios received a 40-year sentence "after her trial." However, Palacios pleaded guilty on July 15, 2014, as part of an agreement in which the State dismissed other related and unrelated charges. See https://circuitclerk.lakecountyil.gov/ publicAccess/html/common/index.xhtml (last visited Sept. 9, 2016).

[3]We do not fault defendant's trial counsel for this deficiency. Palacios' case was still pending when defendant was sentenced; she was sentenced on September 24, 2014. See circuitclerk.lakecountyil.gov/ publicAccess/html/common/index.xhtml (last visited Nov. 1, 2016).

information about Castillo's case, such as evidence relating to his further participation in the murder, the degree of his cooperation with the police or prosecution, the degree of his remorse, or his criminal, personal, or family background—indeed, almost any other specifics relevant to his sentencing—we must conclude that defendant has not met his burden to establish a record on which we can state that Castillo's sentence was *arbitrarily* or *unreasonably* shorter than defendant's.

¶ 61    In sum, we must disagree with defendant that his sentence is excessive, based either on his personal circumstances or on the sentences that his codefendants received. We turn to defendant's second contention on appeal: that the imposition of the mandatory 15-year firearm add-on is unconstitutional as applied, violating the United States Constitution's ban on cruel and unusual punishment and the Illinois Constitution's proportionate-penalties clause.

¶ 62    Defendant notes that our supreme court has not spoken consistently on whether the latter is coextensive with the former or provides greater protections. Compare *People v. Patterson*, 2014 IL 115102, ¶ 106 (stating that proportionate-penalties clause is "co-extensive with the eighth amendment's cruel and unusual punishment clause"), with *People v. Clemons*, 2012 IL 107821, ¶ 40 (stating that proportionate-penalties clause, "which focuses on the objective of rehabilitation, went beyond the framers' understanding of the eighth amendment").[4] However, there is no dispute that the reach of the state provision is at least as great as that of the federal one. Thus, we shall limit our analysis to the proportionate-penalties clause. If defendant's challenge succeeds on that ground, we need not decide whether it would also succeed under the eighth amendment; if it fails under the proportionate-penalties analysis, we may assume that it would not succeed as an eighth-amendment claim either. Of course, the construction of the eighth amendment, especially by the United States Supreme Court, must inform our analysis of the proportionate-penalties issue, as defendant must receive at least the protections of the federal constitution.

¶ 63    The proportionate-penalties clause states, "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. Defendant contends that requiring the trial court to add 15 years to his sentence, solely because he was armed with a firearm during the murder of Campbell, violated this constitutional provision. Defendant returns to the theme that his youth and relatively light criminal record militate against a sentence that, in effect, treated his rehabilitative potential as deserving no weight in the determination of his punishment. He concludes that, in effect, the mandatory 15-year add-on prevented the trial court from

[4]In stating that the reach of the proportionate-penalties clause is coextensive with that of the eighth amendment (and no greater), *Patterson* cited *In re Rodney H.*, 223 Ill. 2d 510, 518 (2006), which in turn relied on *People v. Sharpe*, 216 Ill. 2d 481, 517 (2005), which in turn relied on the statement in *People v. McDonald*, 168 Ill. 2d 420, 455 (1995), that the framers of the proportionate-penalties clause understood that it was "synonymous with the cruel[-]and[-] unusual[-]punishment clause of the eighth amendment." In *Clemons*, the court disapproved of this reading of the proportionate-penalties clause as an "overstatement" and adopted the more expansive interpretation that we have quoted. *Clemons*, 2012 IL 107821, ¶ 40.

We cannot say why the court in *Patterson* abandoned *Clemons'* statement that the proportionate-penalties clause is broader than the cruel-and-unusual-punishment clause and returned to the equivalence theory of *McDonald*, without acknowledging that it had rejected that theory only two years earlier.

following its constitutional obligation to base his sentence not only on the seriousness of his crime but also on the objective of restoring him to useful citizenship. Defendant relies in part on the First District's opinion in *People v. Gipson*, 2015 IL App (1st) 122451, and on several recent Supreme Court decisions that limit the powers of legislatures in sentencing juvenile offenders.

¶ 64     The State responds in part that this court has rejected *Gipson*'s treatment of the mandatory add-on. See *People v. Reyes*, 2015 IL App (2d) 120471, *rev'd*, 2016 IL 119271 (*per curiam*); *People v. Cavazos*, 2015 IL App (2d) 120171 (*Joshua Cavazos*); *People v. Cavazos*, 2015 IL App (2d) 120444 (*Justin Cavazos*). The State argues more generally that, notwithstanding the mandatory add-on of 15 years, the trial court still retained, and exercised, broad discretion in sentencing defendant to a term that it found appropriate under all of the circumstances. The State notes that the court could have sentenced defendant to as little as 35 years' imprisonment for his substantial role in a particularly heinous murder, but chose not to.

¶ 65     We review *de novo* defendant's proportionality argument. See *People v. Hauschild*, 226 Ill. 2d 63, 83 (2007). We turn to the pertinent case law, none of which, admittedly, is squarely on point with this case. We consider first the opinion on which defendant primarily relies.

¶ 66     In *Gipson*, the defendant was 15 years old when he committed the acts that led to his convictions, as an adult, of two counts of attempted first-degree murder. The sentencing range for each offense was 6 to 30 years; however, because the defendant personally discharged a firearm in each instance, each sentence was subject to an automatic enhancement of 20 years. *Gipson*, 2015 IL App (1st) 122451, ¶ 41; see 730 ILCS 5/8-4(c)(1)(C) (West 2006). Also, the appellate court held, the statute required imposing the enhancement on each conviction, even though the defendant had not personally fired at the second victim and was guilty of that attempted murder only as an accomplice. *Gipson*, 2015 IL App (1st) 122451, ¶¶ 41-46. Thus, because the trial court was required to impose consecutive sentences of no less than 26 years each, it had no discretion to impose less than a cumulative 52-year sentence. *Id.* ¶ 49. The defendant argued that, as applied to his case, the statutory scheme that required both that he be sentenced as an adult and that he receive no less than 52 years' imprisonment violated the eighth amendment and the proportionate-penalties clause. *Id.*

¶ 67     The court began its analysis by recognizing three recent Supreme Court decisions that construed the eighth amendment's effect on the sentencing of juveniles in light of their "special characteristics," *i.e.*, a lack of maturity, an underdeveloped sense of responsibility, a greater susceptibility to peer pressure, and an inability to extricate themselves from crime. *Id.* ¶ 52; see *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455 (2012); *Graham v. Florida*, 560 U.S. 48 (2010); *Roper v. Simmons*, 543 U.S. 551 (2005). These distinguishing characteristics, the Court had observed, make juveniles' criminal conduct less morally reprehensible than that of adults. *Gipson*, 2015 IL App (1st) 122451, ¶ 52; see *Miller*, 567 U.S. at ___, 132 S. Ct. at 2464; *Graham*, 560 U.S. at 68; *Roper*, 543 U.S. at 570. As well, juveniles are inherently more capable of change and rehabilitation, and their actions are less indicative of a lack of rehabilitative potential. *Gipson*, 2015 IL App (1st) 122451, ¶ 52; see *Graham*, 560 U.S. at 68; *Roper*, 543 U.S. at 570.

¶ 68     *Gipson* noted that the Supreme Court's recognition of these special considerations for sentencing juvenile offenders had led it to impose restrictions thereon, based on the eighth amendment. *Roper* held that a person who was under 18 when he committed the offense may not be sentenced to death. *Gipson*, 2015 IL App (1st) 122451, ¶ 54; see *Roper*, 543 U.S. at 578.

- 15 -

*Graham* prevented a sentence of life without parole on a juvenile offender who did not commit homicide. *Gipson*, 2015 IL App (1st) 122451, ¶ 54; see *Graham*, 560 U.S. at 74, 82. And *Miller* barred sentencing schemes that mandate life-without-parole sentences for juveniles, even those who commit homicide. *Gipson*, 2015 IL App (1st) 122451, ¶ 55; see *Miller*, 567 U.S. at ___, ___, ___, 132 S. Ct. at 2464, 2469, 2475. These sentencing schemes impermissibly prevent the sentencer from deciding whether it is appropriate to impose "the law's harshest prison term." *Gipson*, 2015 IL App (1st) 122451, ¶ 55; see *Miller*, 567 U.S. at ___, 132 S. Ct. at 2466.

¶ 69    Turning to the case before it, the *Gipson* court first considered the defendant's argument that the sentencing scheme as applied violated the eighth amendment. The court reasoned that, if attempted murder is a homicide offense as defined by *Miller*, then a mandatory sentence of life without the possibility of parole for the defendant would be impermissible. The court disagreed with our statement in *Reyes* and *Joshua Cavazos* that "sentences for a term of years and sentences for natural life without parole are mutually exclusive in the context of juveniles and the eighth amendment." *Gipson*, 2015 IL App (1st) 122451, ¶ 61; see *Reyes*, 2015 IL App (2d) 120471, ¶ 23; *Joshua Cavazos*, 2015 IL App (2d) 120171, ¶ 99. Instead, the court held that the constitutional restrictions on sentencing juveniles to life without parole apply to a sentence that is "in substance a term of natural life without the possibility of parole but in name is a term of years." *Gipson*, 2015 IL App (1st) 122451, ¶ 61. It concluded, however, that this was not so in the case at hand. Based on his life expectancy, the defendant could and likely would be released from prison before he died. Therefore, the sentencing scheme, as applied to him, did not violate the eighth amendment. *Id.* ¶¶ 66-67.

¶ 70    The court did conclude, however, that the application of the sentencing scheme to the defendant violated the proportionate-penalties clause.[5] Initially, the court set out the general standard: "the defendant must demonstrate either that the penalty is degrading, cruel 'or so wholly disproportionate to the offense that it shocks the moral sense of the community' or that another offense containing the same elements has a different penalty." *Id.* ¶ 69 (quoting *People v. Klepper*, 234 Ill. 2d 337, 348-49 (2009)). The court then clarified that whether a penalty is unconstitutionally disproportionate must be decided with reference to both the seriousness of the offense and the character of the defendant, as the plain language of the clause requires this two-pronged approach. *Id.* ¶¶ 71-72.

¶ 71    The court explained that the sentencing scheme at issue had forced the imposition of a penalty that was so wholly disproportionate as to shock the moral sense of the community. *Id.* ¶ 73. Despite the violence of the attack in which he had been involved, and the severity of the injuries to one victim, the record revealed several compelling factors in mitigation: the lack of extensive premeditation; the defendant's mental illness, which, along with his young age, made him prone to impulsive behavior; the likelihood that he had been trying to please his older brother; and the fact that he himself had done little damage. *Id.*

¶ 72    The court acknowledged that the trial court did consider these factors in mitigation. The crux of the problem was that "[t]he sentencing scheme *** did not permit the court to give those factors appropriate weight." *Id.* ¶ 75. Tellingly, the court noted, the trial judge stated on the record that the sentencing scheme rendered irrelevant his own beliefs about what sentence

_____

[5]Relying on *Clemons*, the court concluded that the clause provided more protections than those already given by the eighth amendment. *Gipson*, 2015 IL App (1st) 122451, ¶ 69.

was appropriate—strongly implying that the judge would have imposed a shorter sentence had he been allowed the discretion to do so. *Id.* ¶ 76. Finally, the court found it troubling that the legislature had required the trial court to impose an add-on that was more than three times as long as the defendant's actual Class X sentence. *Id.*

¶ 73    In making this final observation, the *Gipson* court noted that this court had also expressed concern about the restrictions that mandatory enhancements place on trial courts' sentencing of juvenile defendants. *Id.*; see *Joshua Cavazos*, 2015 IL App (2d) 120171, ¶ 102. Of course, as the State emphasizes, in neither *Cavazos* opinion, nor in *Reyes*, did this court find any proportionate-penalties violation. We turn to those opinions.

¶ 74    In *Justin Cavazos*, the defendant was 16 years old when one person was killed and another injured in a drive-by shooting. Justin and his brother, Joshua, who was 17 when the victims were shot, were charged and tried, and Justin was convicted by a jury of first-degree murder, attempted murder, and two other felonies. Because the jury found that Justin, or one for whom he was responsible, committed the first-degree murder and the attempted murder while armed with a firearm, his total sentence would include two mandatory 15-year enhancements (see 730 ILCS 5/5-8-1(a)(1)(d)(i) (West 2006)). He received an aggregate sentence of 60 years' imprisonment. *Justin Cavazos*, 2015 IL App (2d) 120444, ¶ 2. On appeal, he argued in part that the combined effect of the mandatory transfer of his case to adult court (see 705 ILCS 405/5-130(1)(a)(i) (West 2006)), the mandatory firearm enhancements, the mandatory consecutive sentencing, and the mandatory denial of good-conduct credit was to deny the sentencing court the discretion to consider his youth as a mitigating factor, thus violating the eighth amendment and the proportionate-penalties clause. *Justin Cavazos*, 2015 IL App (2d) 120444, ¶ 81.

¶ 75    We rejected Justin's claim, albeit with misgivings about the legislature's willingness to restrict the discretion of trial courts that are given the difficult task of deciding appropriate punishments for juvenile offenders. We began by summarizing the Supreme Court's recent eighth-amendment jurisprudence in *Roper*, *Graham*, and *Miller*. After following Illinois authority holding that the mandatory-transfer provision cannot violate the eighth amendment or the proportionate-penalties clause because it imposes no sentence (*id.* ¶ 85; see, *e.g.*, *Patterson*, 2014 IL 115102, ¶¶ 89-111), we turned to Justin's challenges to the provisions that did dictate certain aspects of sentencing.

¶ 76    We explained first that the mere application of rules for adult sentences to sentences for juveniles creates no constitutional difficulties, because the Supreme Court had required only that the trial court be given the opportunity to consider mitigating factors "before imposing the *harshest possible penalty* for juveniles." (Emphasis in original.) *Justin Cavazos*, 2015 IL App (2d) 120444, ¶ 86 (quoting *Miller*, 567 U.S. at ___, 132 S. Ct. at 2475). Justin had not received the harshest possible penalty, which was life without the possibility of parole. *Id.* ¶ 87. In contrast to what *Gipson* later held, we rejected categorically the concept of a " '*de facto*' life sentence." *Id.* Also, to the extent that the Supreme Court's recent opinions could be read to require that a court sentencing a juvenile must be allowed to consider in mitigation his youth at the time of the offense, that had happened there; the trial court had explicitly acknowledged Justin's youth and had imposed the minimum term for murder and a term only four years more than the minimum for attempted murder. *Id.* ¶ 88.

¶ 77    We did, nonetheless, state that the sentencing scheme to which Justin (and other juveniles) had been subjected was worthy of the legislature's reexamination. *Id.* ¶ 89. We recognized that

a judge who believes that a minimum sentence for a juvenile defendant is warranted cannot avoid the effect of mandatory add-ons that could require a total sentence in excess of what the judge finds appropriate under all the circumstances. *Id.* ¶ 90. There, for example, the court decided on the minimum 20-year sentence for the murder and a near-minimum sentence of 10 years for the attempted murder, yet was required to add a total of 30 years to the aggregate sentence based solely on the mandatory firearm enhancements. This was particularly disturbing to us insofar as the add-on for the attempted murder exceeded the underlying sentence. The severity with which these add-ons restricted the trial court's ability to consider the mitigating factor of Justin's youth was troubling. *Id.* Nonetheless, we held that the application of these enhancements in the case before us did not violate the eighth amendment or the proportionate-penalties clause.

¶ 78    In *Joshua Cavazos*, the defendant was convicted of both first-degree murder and attempted first-degree murder. He was sentenced to mandatorily consecutive terms of (1) 25 years for first-degree murder, plus a mandatory add-on of 25 years because he personally discharged a firearm during the commission of the offense and (2) 10 years for attempted first-degree murder, plus a mandatory add-on of 20 years for personally discharging the firearm. Joshua also received a concurrent three-year term for possession of a stolen motor vehicle. On Joshua's motion, the trial court reduced the aggregate sentence by 5 years, to a total of 75 years. *Joshua Cavazos*, 2015 IL App (2d) 120171, ¶¶ 60-61.

¶ 79    This court affirmed the judgment, relying on the same reasoning that we used in *Justin Cavazos*, including the rejection of the concept of a *de facto* life sentence. *Id.* ¶¶ 97-100. We also expressed the same reservations as in *Justin Cavazos* about the wisdom of legislating mandatory add-ons that severely restrict a trial court's discretion to consider a defendant's juvenile status as a substantial mitigating factor. *Id.* ¶¶ 101-02.

¶ 80    In *Reyes*, which we issued shortly after both *Cavazos* opinions, the defendant, who was 16 years old when he was charged, was convicted of first-degree murder and sentenced to a total of 45 years' imprisonment, representing the statutory minimum plus a mandatory 25-year firearm add-on (730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2008)). He was also convicted of two counts of attempted murder and sentenced to 26 years' imprisonment for each, representing the statutory minimum plus a mandatory 20-year firearm add-on (see 730 ILCS 5/5-8-1(a)(1)(d)(ii) (West 2008)). By law, he was required to serve all the terms consecutively. Thus, his aggregate sentence was 97 years' imprisonment, of which he would have to serve at least 89 years. *Reyes*, 2015 IL App (2d) 120471, ¶¶ 3-6.

¶ 81    On appeal, the defendant argued that the combined effect of the mandatory firearm enhancements and the consecutive-sentencing provisions was the imposition of a *de facto* life sentence without the possibility of parole (97 years) for crimes that he had committed when he had been under 18 years old, in violation of *Miller*'s prohibition against mandatory life sentences for juvenile offenders. *Id.* ¶ 16. This court disagreed, holding that *Miller* prohibited the mandatory imposition of the harshest possible penalty for a single offense by a juvenile and that, because none of the defendant's sentences met this criterion, the multiple sentences did not violate *Miller*, regardless of their cumulative effect. *Id.* ¶ 23. We declined to extend *Miller*, *Roper*, and *Graham* to "*de facto* life sentences," a term that we considered as dangerously imprecise. *Id.* ¶ 25.

¶ 82    The supreme court reversed. The court agreed with the defendant—and the State—that *Miller* bars a statutorily mandated term of life without the possibility of parole (literal or

- 18 -

*de facto*) "for a single offense or for offenses committed in a single course of conduct." *Reyes*, 2016 IL 119271, ¶ 8. "A mandatory term-of-years sentence that cannot be served in one lifetime has the same practical effect on a juvenile defendant's life as would an actual mandatory sentence of life without parole—in either situation, the juvenile will die in prison." *Id.* ¶ 9. But *Miller* prevents the legislature from effectively requiring a court to sentence a juvenile to life without the possibility of parole "without first considering in mitigation his youth, immaturity, and potential for rehabilitation." *Id.*

¶ 83    The court thus held that the application of the statutory sentencing scheme resulted in a "mandatory, *de facto* life-without-parole sentence" for the defendant, who had been 16 years old when he committed the offense and would be eligible for parole only after serving 89 years of that sentence—*i.e.*, at age 105. *Id.* ¶ 10. Thus, the court vacated the sentence and remanded the cause for resentencing, at which the trial court would have the discretion not to apply the firearm-based enhancements. *Id.* ¶ 12. Without these enhancements, the mandatory minimum sentence was 32 years, which was permissible because it was not a *de facto* life sentence. *Id.*

¶ 84    We turn to the application of the foregoing case law to defendant's claim that the application of the mandatory firearm add-on to his sentence violated the proportionate-penalties clause. We begin by observing that the Supreme Court precedents are of no aid to defendant. Although he contends that the reasoning on which they are based should apply to his case, in which he was less than a year past his eighteenth birthday when he committed his offense, those opinions explicitly limit their scope to the sentencing of those who were under 18 years old at the time of their crimes. See *Miller*, 567 U.S. at ___, 132 S. Ct. at 2473-75; *Roper*, 543 U.S. at 574. The Court has clearly drawn a bright line that forbids applying its holdings to defendant:

> "Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity some adults will never reach. For the reasons we have discussed, however, a line must be drawn. *** The age of 18 is the point where society draws the line for many purposes between childhood and adulthood." *Roper*, 543 U.S. at 574.

In any event, the Court's eighth-amendment jurisprudence would be of no help to defendant. He did not receive the harshest possible penalty for his crime, and the sentencing scheme, considered as a whole, gave the trial court the discretion to impose a prison term of as little as 35 years. That is not a *de facto* life sentence.

¶ 85    The Illinois cases do not help defendant in advancing his claim that his sentence violated the proportionate-penalties clause. In part this is because of the same considerations that distinguish defendant's case from those that the Supreme Court decided in *Miller*, *Roper*, and *Graham*. Defendant was not under 18 years old when he committed his offense—in contrast to the defendants in *Gipson*, the *Cavazos* cases, and *Reyes*. In all of those cases, the defendants based their challenges to the mandatory enhancements on the Supreme Court's opinions, which drew a bright line between defendants who committed their offenses before reaching the age of 18 and those who committed them after attaining that age. In *Gipson* and *Reyes*, the appellate court and the supreme court (respectively) based their grants of relief on those Supreme Court opinions and did not extend their holdings or rationales to defendants who were over age 18 when they committed their crimes.

¶ 86 Moreover, in this case, the sole basis of defendant's proportionate-penalties claim is the 15-year mandatory add-on, applied once, and still giving the trial court the discretion to impose a sentence of as little as 35 years for a first-degree murder (and one that the jury found was so brutal or heinous as to qualify defendant for life imprisonment). This is in stark contrast to the situations in *Gipson*, the *Cavazos* cases, and *Reyes*. In *Gipson*, the defendant was subject to two mandatory add-ons totaling 40 years, plus mandatory consecutive sentences, raising his minimum aggregate sentence from 12 years to 52 years—an increase of 333% (or, viewed in another light, about half of a total average human life expectancy). In *Justin Cavazos*, the defendant was subject to two mandatory add-ons, one of which was 5 years shorter than his base sentence and the other of which was only 5 years longer, plus mandatory consecutive sentences, raising his otherwise lenient aggregate sentence from 30 years to 60 years—an increase of 100%, which was modest only in comparison to *Gipson*. In *Joshua Cavazos*, the defendant was subject to mandatory add-ons of 45 years, which increased his aggregate sentence from 30 years to 75 years—an increase of 150%, again modest only in comparison to *Gipson*. In *Reyes*, where the defendant was subject to multiple enhancements, his aggregate sentence was 97 years, consisting of three mandatorily consecutive minimum sentences totaling 32 years and three mandatory enhancements totaling 65 years—an increase of 203%.

¶ 87 The percentages of the increases required by these enhancements show their extreme effects even on judges who were inclined to show leniency based on the defendants' youth or other mitigating circumstances. These effects, even when constitutionally permissible, dwarf that of the mandatory enhancement here. In the four Illinois precedents we have discussed, the mandatory enhancements (including mandatory consecutive sentences) *drastically* limited the trial judges' latitude in applying factors in mitigation. And, in those cases, there was reason to believe that the mandatory enhancements frustrated the trial judges' intentions by imposing sweeping legislative mandates that had draconian consequences and restricted or nearly neutralized the judges' application of individualized attention to the circumstances of the particular defendants.

¶ 88 That is far from the situation here. Defendant faced a minimum sentence of 20 years without the mandatory enhancement and 35 years with it. The trial court, finding numerous factors in aggravation and little in mitigation, sentenced him to 44 years' imprisonment plus the 15-year add-on. The discretionary portion of defendant's aggregate term of 59 years greatly exceeded the mandatory portion. To the extent that he received a *de facto* life sentence, it was less the result of the add-on and more the result of the trial court's exercise of its still-considerable discretion. Based on its individualized assessment of defendant's criminal conduct, character, and background, the court chose a base sentence that was 24 years more than the minimum—but 16 years less than the maximum, even discounting the available option of life imprisonment based on exceptionally brutal or heinous conduct.

¶ 89 These realities do not support any contention that the application of the mandatory add-on resulted in a sentence that shocks the conscience of the community or is inconsistent with precedent from either the Supreme Court or our state's courts. Defendant's proportionate-penalties claim fails.

¶ 90 For the foregoing reasons, the judgment of the circuit court of Lake County is affirmed. As part of our judgment, we grant the State's request that defendant be assessed $50 as costs for this appeal. 55 ILCS 5/4-2002(a) (West 2014); see als*o People v. Nicholls*, 71 Ill. 2d 166, 179

(1978).

¶ 91            Affirmed.